[No. A030366. First Dist., Div. Three. Jan. 30, 1989.]

JANNET SCHRAER et al., Plaintiffs and Respondents, v.
BERKELEY PROPERTY OWNERS' ASSOCIATION et al.,
Defendants and Appellants.

**COUNSEL**

David W. Greenthal, James S. Ader and Thomas A. Seaton for Defendants and Appellants.

Zona Sage and Stuart Buckley for Plaintiffs and Respondents.

**OPINION**

**WHITE, P. J.**—Muriel Rosenkranz, Karen Koelker, and the Berkeley Property Owners' Association (BPOA) appeal from an order granting an

injunction prohibiting harassment pursuant to Code of Civil Procedure section 527.6. Because of errors in the proceedings below, we must reverse.

I

This controversy arose out of a well-publicized dispute over the occupancy of a piece of residential property located at 1436 Allston Way in Berkeley. The house in question was owned by Claire Morrison, an elderly widow. According to press accounts in the trial record, Ms. Morrison was voluntarily placed in a nursing home after the death of her husband. A conservator who was appointed to manage Morrison's affairs proceeded to rent the subject property to a certain John Kojro, apparently without Morrison's knowledge or consent. Kojro in turn sublet the house to respondents Jannet and Martha Schraer. In late 1982, Morrison's conservatorship came to an end. Morrison thereafter began making various legal and extra-legal efforts to have the Schraers evicted as tenants, which the latter resisted.

In or about July 1984, appellant Koelker read an article in the Berkeley Voice describing the Morrison property dispute. Koelker contacted Morrison and promised to assist her in attempting to regain possession of her property. On September 5, 1984, the Berkeley Voice published a letter signed by Koelker discussing the Morrison situation. This letter blamed Morrison's inability to evict respondents on the Berkeley rent control ordinance, gave the telephone number of an organization called "Friends of Claire Morrison," and solicited volunteers to assist Morrison "get back her home."

Concerned about Koelker's letter, Martha Schraer called the telephone number published in the letter. She spoke with Koelker, who told her that the "Friends of Claire Morrison" group was planning to picket the 1436 Allston Way house on September 12, 1984, at 5 p.m. Respondents did not attempt to stop the picketing by obtaining an injunction or temporary restraining order. They did publicize their side of the story by giving interviews to members of the print and television press, including television stations KRON, KGO, and KTVU, radio station KPFA, the San Francisco Chronicle, the San Francisco Examiner, the Oakland Tribune, and the Daily Californian. As a result, the dispute quickly gained widespread publicity before the date of the planned picketing.

On September 12, 1984, the Daily Californian published an article on the Allston Way controversy, which featured an interview with respondent Jannet Schraer, together with her photograph, on the front page. The article also contained an interview with appellant Rosenkranz, at that time the president of the BPOA. The article stated that the picketing would take

place that day, and attributed to Rosenkranz a statement that "the BPOA may picket the house in the future if the tenants do not move out."

The picketing began at approximately 5 p.m. Both Koelker and Rosenkranz participated, along with about 23 other persons. Most carried signs and shouted slogans while walking in a circle on the street and sidewalk in front of the house. The picketing lasted approximately one hour. Four or five of the picketers were members of the BPOA.

Respondent Jannet Schraer acknowledged in deposition that during the picketing, no one was denied access to the house; to the contrary, several members of the news media entered the house during the picketing to interview Ms. Schraer.[1] She herself left the house at approximately 6 p.m., without being blocked or impeded. She admitted that none of the picketers shouted any threats or insults. There were no complaints by any neighbors about the gathering, and no one called the police.

On September 21, 1984, Berkeley political activist and mayoral candidate Eldridge Cleaver issued a "public notice" espousing Morrison's position, pledging to evict the occupants of the Allston Way house and secure possession of the house for Morrison, and calling for 25 "combat veterans" to assist him in this enterprise. On September 26, 1984, the Berkeley Voice published an article on Cleaver's statement, attributing to Cleaver an intent to use "armed . . . force to storm the house." The article quoted Rosenkranz, identified as president of the BPOA, as expressing "shock" at Cleaver's plans, and stating her opinion that " 'there are other ways to get them [the Schraers] out. But if it gets Clare [Morrison] back in her house and he's willing to take the risks, then O.K.' "

On October 3, 1984, the Berkeley Voice published a letter from Rosenkranz, again expressing support for Morrison's position in strong terms, and deriding respondents as "squatters" who should be evicted by extrajudicial means if necessary. On October 4, 1984, respondents' attorney, Ms. Zona Sage, telephoned the offices of the BPOA in an attempt to contact Koelker. She spoke with Rosenkranz. Without identifying herself as the attorney for the tenants of the disputed property, Sage stated that she was a "property owner" calling to determine whether further picketing would occur. According to Sage, Rosenkranz told her that "BPOA planned future picketing" of the house. Contrary to Sage's version of the conversation, Rosenkranz denied telling the caller that any further picketing would take place.

---

[1] Although she had occupied the Allston Way house at one time, Martha Schraer left the house in January 1984, long before the events at issue.

On October 4, 1984, respondents filed the instant petition for an injunction prohibiting harassment pursuant to section 527.6 of the Code of Civil Procedure. In their petition, the Schraers alleged that the BPOA had organized picketers outside their home; that the picketers had been abusive, had shouted at the Schraers to leave their home, and had blocked the sidewalk outside the home; that "[o]n October 4, 1984[,] [the BPOA] indicated that they would undertake further picketing in front of [the Schraers'] home, in a telephone conversation with [the Schraers'] attorney"; that the Schraers "are informed and believe and on those grounds allege that all of the above defendants are acting in concert with Eldridge Cleaver in threatening to remove plaintiffs from the lawful possession of their home by the use of force"; that the Schraers "are in great fear for their lives and physical well being, for the safety of their property and of their visitors"; and that "[t]hey suffer the constant anxiety of insecurity about their home and the psychological distress any person of ordinary sensitivity would feel in this situation."[2]

The trial court, Judge Winton McKibben, issued a temporary restraining order (TRO) ordering Koelker, Rosenkranz and the BPOA to refrain from threatening, following or telephoning the Schraers, to refrain from keeping them under surveillance or blocking their movements in public places or thoroughfares, and to remain at least 500 yards away from 1436 Allston Way and from the Schraers. In addition, the TRO ordered appellants to "[r]efrain from soliciting others to remove [the Schraers] from the lawful possession of their home; [to r]efrain from threatening to remove [the Schraers] from the lawful possession of their home; [and to r]efrain from soliciting others to do any of the other acts prohibited by this order." The trial court set a hearing date of October 22, 1984, for appellants "to give any legal reason why there should not be issued against [them] an Injunction Prohibiting Harassment, and such other relief as the Court may order."

On October 12, 1984, a candlelight vigil was held on the sidewalk in front of 1436 Allston Way. Neither Koelker nor Rosenkranz was present at this gathering. Respondents' attorney, who witnessed the vigil, was not able to identify any of the approximately 11 participants as being a member of the BPOA. On October 17, 1984, the Berkeley Voice published a letter from Koelker praising Eldridge Cleaver as "the only *man* left among us . . . with courage to do something, anything, besides stand around and complain and fill out forms? . . ."

On October 19, 1984, respondents' attorney, Zona Sage, contacted the court and all of the attorneys for appellants and notified them that

---

[2] As noted above, despite the allegations in the petition, Martha Schraer was no longer a resident at 1436 Allston Way.

respondents would not be proceeding with the hearing on October 22. Later that day, attorney Sage received a telephone call from Morrison, in which the latter informed Sage that she intended to come to 1436 Allston Way to make a " 'thorough inspection of the house.' " Sage then contacted Morrison's attorney; according to a declaration by Sage, he told Sage that he knew nothing of Morrison's plans for a visit, and that he "would attempt to contact [Morrison] to restrain her from going . . . ." The following day, October 20, 1984, several persons gathered on the front porch of 1436 Allston Way. Appellant Koelker was in this group, along with Morrison and Cleaver; however, Rosenkranz was not present. The Berkeley police were called. After they ascertained that the TRO was still in effect, the police arrested Cleaver and Koelker, and the group dispersed.

As a result of this event, respondents' attorney proceeded with the October 22, 1984, hearing on respondents' petition for an injunction, as originally scheduled. The parties submitted written and oral arguments of counsel, together with some declarations by Jannet Schraer and respondent's attorney, Sage, with attached copies of various newspaper articles and clippings. There was no live testimony by any witnesses. The trial court appeared to indicate several times that it could not decide the matter at that point without more evidence. On the other hand, the court also declined to permit live testimony or cross-examination of declarants, and expressly permitted the admission of hearsay evidence. The matter was continued until November 5, 1984, with the TRO remaining in effect, to permit all the parties involved to be served and to give more time for the submission of additional evidence.

On October 31, 1984, Rosenkranz filed a motion for peremptory disqualification pursuant to Code of Civil Procedure section 170.6 seeking to have the matter reassigned from Judge McKibben. At the second hearing, on November 5, 1984, Judge McKibben denied the peremptory challenge. Contrary to indications it had given at the previous hearing, the trial court now stated that the matter did not involve any First Amendment issues. The court again refused to allow the presentation of any oral testimony or the cross-examination of any of the declarants of the various declarations submitted, although they were present in court. Over the objections of counsel for appellants, the court made it abundantly clear that it was going to issue its ruling on the basis of the written declarations submitted, the newspaper accounts and clippings introduced as evidence, and the arguments of counsel, whether or not the evidence was hearsay.[3]

---

[3] In refusing to permit the introduction of oral testimony or cross-examination, the trial court stated: "[T]he only significance of what has occurred in the past is that it is a prelude to what might occur in the future. And the purpose of the order is to prevent persons from doing anything in the future that's in violation of the law. . . . And I don't think, you know,

The trial court granted the injunctive relief sought by respondents, ordering appellants "to maintain the peace and quiet," and to refrain "from making any provocative statements." A written order was filed on December 6, 1984, to this effect. This order did not mention picketing. It specified that appellants: "(1) Shall respect the peace and quiet of [the Schraers]; [¶] (2) Shall abide by all laws; [¶] (3) Shall refrain from provocative statements regarding [the Schraers] or said premises." The order went on to order that Rosenkranz and Koelker: "(4) Shall give written 72-hour advance notice to [the Schraers'] attorney of any intention to inspect the premises at 1436 Allston Way, Berkeley, California; and [¶] (5) Shall participate in any inspection of said premises with the owner of same, only in reasonable numbers."

On November 27, 1984, the BPOA board of directors passed a resolution stating that the persons who picketed the Schraers' residence on September

what [Cleaver or appellants] did in the past is beside the point. This isn't a suit for damages. [¶] And if the [Schraers] want to sue [Cleaver or appellants] for damages as a result of anything, then, they are going to have to commence an independent action. They are going to have to prove their case. We are not at that stage at all. We have never got there. [*sic.* ] [¶] All we are talking about is harrassment [*sic*]. . . . And the only purpose of the order is to protect the [Schraers] in the event something happens. . . .

"[Y]ou are all going on and on and on here like this was a full blown trial. It is not that. . . . [¶] Insofar as protracting the proceeding, this matter, to a great extent . . . I think the last time that we were here, it was indicated that Mrs. Rosenkranz had made these statements that Mrs. Sage has just referred to. And they appeared in the press. And I indicated at that time though that might be hearsay, the question was whether or not, whether it was hearsay, whether it was what the [Schraers] had learned by this kind of statement, what did they learn from the press and if those things were said. And apparently they were. And there has been nothing to refute this statement. . . . [¶] But an organization such as this [BPOA] or any other organization acts only through some representative. And if this lady, . . . Mrs. Rosenkranz has made certain statements saying I am the president of this organization and I am going to do this and this and this, then, she's obviously attributing to her organization something which she has no right to do if the organization says that she doesn't. . . . But there has been nothing presented to me to my knowledge that has disavowed her conduct. . . . In any way, shape or form. . . . [¶] If [the BPOA] doesn't act through Mrs. Rosenkranz, you ought to present it here if you don't want to be bound by her conduct. [¶] But as I understand it from the prior proceeding and from [what] Mrs. Sage [respondents' attorney] just said now, there has been some conduct and statements made by Mrs. Rosenkranz that says she is acting on behalf of your organization."

In response to the objection of the BPOA's attorney that it was the respondents who had the burden of proving harassment by clear and convincing evidence, and not appellants who had to prove their innocence of the charges made, the trial court responded, somewhat confusingly, "But if [the burden of proof] is not, if it is not met and the statements were made in the press, even though it may be hearsay, the question is whether or not they were made? And if they were made the [Schraers have] a right to be anxious about them." When it was then pointed out that Mrs. Rosenkranz had affirmatively stated in her declarations that her earlier public statements had been made "in her individual capacity," the trial court responded: "But the press didn't say that. So, somebody else from your organization [BPOA] better refute her and say this is not our organization. She is not acting for it. She is acting beyond the authority given to her. And they haven't done that. She said it. And it is worth no more than nothing."

12, 1984, were not acting on behalf of the BPOA in so doing, that the BPOA had never adopted any position with regard to the events alleged by the Schraers, and that any statements made by any officer, director, or member of the BPOA regarding issues of public concern were made by such person as an individual unless authorized by the BPOA board of directors or membership to do so on behalf of the BPOA. On December 29, 1984, the BPOA board of directors passed a further resolution expressly disavowing and repudiating any representations by any person, including members or officers of the BPOA, to the effect that the BPOA had authorized the picketing at 1436 Allston Way, and again stating that any member or officer who so participated did so as an individual and not as a representative of the BPOA. BPOA moved to dissolve the injunction nunc pro tunc, based on these resolutions. Upon publication of the second resolution in the Daily Californian, the trial court dissolved the injunction as to the BPOA. However, it only did so *prospectively,* as of the date of the order (April 4, 1985).

On March 8, 1985, respondents filed a motion to recover attorney fees and court costs from appellants in an amount in excess of $35,000. The trial court declined to rule on attorney fees because of the pendency of this appeal. On April 2, 1985, at respondents' petition, the trial court issued an order to show cause against Koelker for having allegedly violated the order of December 6, 1984, by making "provocative" public statements at a March 4, 1985, meeting of the Berkeley Rent Stabilization Board, and by writing a letter to the director of the Berkeley Rent Stabilization Board, published in the Berkeley Voice on March 27, 1985, expressing outrage over Morrison's situation. At respondents' request, the contempt matter was subsequently removed from the calendar.[4]

## II

At the threshold, we must consider respondents' contention that this entire appeal is moot. Under the terms of the controlling statute, Code of Civil Procedure section 527.6, any injunction against "harassment" under that section "shall have a duration of not more than three years." (Code Civ. Proc., § 527.6, subd. (d).) The harassment injunction in this case was first issued at the hearing on November 5, 1984, and then filed in written form on December 6, 1984. The injunction against the BPOA was dissolved as of April 4, 1985, and the injunctions against Rosenkranz and Koelker have now also expired.

---

[4] Appellants have requested that this court take judicial notice of the fact that the Schraers have filed a cross-complaint for damages against them and others based largely on the same allegations made in the instant harassment action. Pursuant to Evidence Code sections 452 and 459, we take judicial notice of that cross-complaint which is in the case of Morrison v. Kojro, Schrum et al. (Super. Ct., Alameda County, No. 587430-7.)

■ As a general rule, when an event has occurred pending appeal from a lower court judgment which " 'renders it impossible' " for the appellate court to grant an appellant " 'any effectual relief whatever,' " the appeal will be dismissed as moot. (*Consol. etc. Corp.* v. *United A. etc. Workers* (1946) 27 Cal.2d 859, 863 [167 P.2d 725].) There is a significant exception to this rule, however, where the appeal raises an important issue that is likely to recur, yet evade review. (*Evans Products Co.* v. *Millmen's Union No. 550* (1984) 159 Cal.App.3d 815, 820, fn. 5 [205 Cal.Rptr. 731]; *Money* v. *Krall* (1982) 128 Cal.App.3d 378, 392 [180 Cal.Rptr. 376].) "If an action involves a matter of continuing public interest and the issue is likely to recur, a court may exercise an inherent discretion to resolve that issue, even though an event occurring during its pendency would normally render the matter moot." (*Liberty Mut. Ins. Co.* v. *Fales* (1973) 8 Cal.3d 712, 715-716 [106 Cal.Rptr. 21, 505 P.2d 213]; see also *Libertarian Party* v. *Eu* (1980) 28 Cal.3d 535, 539-540 [170 Cal.Rptr. 25, 620 P.2d 612]; *Green* v. *Superior Court* (1974) 10 Cal.3d 616, 622, fn. 6 [111 Cal.Rptr. 704, 517 P.2d 1168]; *Carnation Co.* v. *Olivet Egg Ranch* (1986) 189 Cal.App.3d 809, 812-813 [229 Cal.Rptr. 261]; *Downtown Palo Alto Com. for Fair Assessment* v. *City Council* (1986) 180 Cal.App.3d 384, 391-392 [225 Cal.Rptr. 559].)

We agree with appellants that the instant appeal presents significant issues of statutory construction and procedure that affect the public interest and should be reviewed on appeal. The statute in question, section 527.6 of the Code of Civil Procedure, establishes a unique procedure for obtaining a unique form of injunctive relief, which combines aspects of both provisional and permanent relief. The manner in which this statute was applied and enforced by the trial court in this case has been challenged by the appellants, and raises significant issues that are virtually certain to arise again. Yet this issue is also likely to evade review, because of the limited life of injunctions issued under section 527.6. Applying a strict standard of mootness, such as respondents would have us do, would effectively deprive persons affected by injunctions of limited duration from obtaining any judicial review.

Therefore, in the exercise of this court's inherent discretion, we decline to dismiss these appeals as moot.

### III

■ Appellant Rosenkranz argues that the trial court should have recused itself in response to her motion pursuant to Code of Civil Procedure section 170.6. This statute provides for peremptory challenges to trial judges, where, in accordance with certain procedures, such challenges are

made prior to any hearing, proceeding or motion involving a determination of contested fact issues relating to the merits.

Here, Rosenkranz filed her peremptory challenge on October 31, 1984, which was five days prior to the November 5, 1984, hearing at which the trial court ruled in favor of respondents. Prior to Rosenkranz's motion, the trial court had issued a temporary restraining order on October 4, 1984, and had held a hearing on October 22, 1984, at which arguments had been presented but no factual determinations were made. Respondents argue that because Rosenkranz had notice at the October 4 hearing that the matter would be set before Judge McKibben 18 days later, she was required by the terms of Code of Civil Procedure section 170.6, subdivision (2) to file her challenge no later than October 17, or 5 days *before* the October 22 hearing date.

A ruling on an application for a temporary restraining order is not a ruling on a contested issue of fact, and a judge who has issued such an order may nonetheless be subject to a subsequent peremptory challenge under Code of Civil Procedure section 170.6. (*Landmark Holding Group, Inc.* v. *Superior Court* (1987) 193 Cal.App.3d 525, 527-529 [238 Cal.Rptr. 475].) There is no question that Rosenkranz was permitted to make a peremptory challenge after the issuance of the temporary restraining order on October 4, 1984. Nevertheless, she waited until after the first hearing on the petition for the injunction, on October 22, 1984, to make her challenge. Under Code of Civil Procedure section 170.6, subdivision (2), "[w]here the judge . . . assigned to or who is scheduled to try the cause or hear the matter is known at least 10 days before the date set for trial or hearing, *the motion shall be made at least five days before that date.*" (Italics added.) Because she had learned that Judge McKibben would be presiding more than 10 days earlier, Rosenkranz was required by the express terms of section 170.6 to make her peremptory challenge at least 5 days prior to the October 22, 1984, hearing, even though Judge McKibben arguably made no factual determinations relating to the merits at that hearing. There was therefore no error in the denial of the peremptory challenge.

IV

We now turn to the manner in which the trial court interpreted the harassment statute, Code of Civil Procedure section 527.6. The appellants urge that the trial court erred in disallowing relevant oral testimony. We agree.

Section 527.6 of the Code of Civil Procedure was enacted "to protect the individual's right to pursue safety, happiness and privacy as guaranteed by

the California Constitution." (Stats. 1978, ch. 1307, § 1; Cal. Const., art. I, § 1.) The purpose of the statute was to provide expedited injunctive relief to victims of "harassment." (*Smith* v. *Silvey* (1983) 149 Cal.App.3d 400, 405 [197 Cal.Rptr. 15].) The statute itself defines harassment as "a knowing and willful course of conduct directed at a specific person which seriously alarms, annoys, or harasses the person, and which serves no legitimate purpose. The course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the plaintiff." The statute defines "[c]ourse of conduct" as "a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose"; and it expressly states that "[c]onstitutionally protected activity is not included within the meaning of 'course of conduct.'" (Code Civ. Proc., § 527.6, subd. (b).)

The statute sets out a special procedure under which a plaintiff may first obtain a temporary restraining order in accordance with Code of Civil Procedure section 527, subdivision (a). Such a temporary restraining order may remain in effect for no more than 15 days, and may be granted "with or without notice upon an affidavit which, to the satisfaction of the court, shows reasonable proof of harassment of the plaintiff by the defendant, and that great or irreparable harm would result to the plaintiff." (Code Civ. Proc., § 527.6, subd. (c).)

Within 15 days of the filing of a petition, a hearing must be held. The defendant may file a response explaining, justifying or denying the alleged harassment; or he or she may file a cross-complaint for harassment. "At the hearing, the judge *shall receive such testimony as is relevant,* and may make an independent inquiry. If the judge finds by *clear and convincing evidence* that unlawful harassment exists, an injunction shall issue prohibiting the harassment." (Code Civ. Proc., § 527.6, subd. (d), italics added.) Harassment injunctions are limited to durations of not more than three years. The statute provides for an award of court costs and attorney fees to the prevailing party in any action brought under the statute, and states that "[a]ny willful disobedience" of any temporary restraining order or injunction granted under the statute is punishable as a misdemeanor under Penal Code section 273.6. (Code Civ. Proc., § 527.6, subds. (d), (h), (i).)

Thus, although the procedures set forth in the harassment statute are expedited, they contain certain important due process safeguards. Most notably, a person charged with harassment is given a full opportunity to present his or her case, with the judge *required* to receive relevant testimony and to find the existence of harassment by "clear and convincing" proof of a "course of conduct" that actually and reasonably caused *substantial* emo-

tional distress, had "no legitimate purpose," and was not a "constitutionally protected activity."

In our opinion, these statutory safeguards were not followed in the instant case. Contrary to the express requirements of the statute, the trial court expressly refused to permit the introduction of oral testimony, and based its decision entirely on written declarations, newspaper articles, and the arguments of counsel. The trial court repeatedly stated that it was not required to make a factual determination of "what has occurred in the past," but was only supposed to "keep the peace" by preventing possible *future* violations of the law. The court went on to base its conclusion that future harassment *might* occur by relying on concededly hearsay press accounts of what the appellants had said or were represented to have said; it then explicitly shifted to appellants the burden of proving that the statements were *not* made or were not authorized. In so doing, the trial court manifested a fundamental misunderstanding of its role under the procedural statute in question.

Respondents defend the trial court's handling of the statutory procedure, contending that it was not obliged to take oral testimony. ■ First, they cite Code of Civil Procedure section 2002, which states that the "testimony of witnesses is taken in three modes: [¶] 1. By affidavit; [¶] 2. By deposition; [and] [¶] 3. By oral examination." However, this statute does not actually *define* all of these means of *taking* witness testimony *as* "testimony" per se for all purposes; it simply sets forth the three ways in which testimony may be "taken." Code of Civil Procedure section 2002 cannot be used to read into every other statutory use of the word "testimony" a license to use affidavits or deposition transcripts for all the same purposes as oral examination; such a statutory reading would conflict with constitutional and statutory rights to confront and cross-examine witnesses in both criminal and noncriminal proceedings. (*Goldberg* v. *Kelly* (1969) 397 U.S. 254, 259 [25 L.Ed.2d 287, 294, 90 S.Ct. 1011]; *August* v. *Department of Motor Vehicles* (1968) 264 Cal.App.2d 52, 60-64 [70 Cal.Rptr. 172]; *McCarthy* v. *Mobile Cranes, Inc.* (1962) 199 Cal.App.2d 500, 506-510 [18 Cal.Rptr. 750].)

Neither does Code of Civil Procedure section 2009 control in this case, contrary to respondents' contention. That statute provides that affidavits may be used "to obtain a provisional remedy . . . and in any other case expressly permitted by statute." In contrast, the statute at issue here, Code of Civil Procedure section 527.6, clearly distinguishes between the initial 15-day temporary restraining order, which expressly *may* be obtained "upon an *affidavit* which, to the satisfaction of the court, shows *reasonable proof* of harassment . . ."; and the subsequent injunction with a duration of up to

three years, which can only be granted under the far more strictly delimited procedures of a hearing with testimony and upon proof by *clear and convincing evidence.* (Code Civ. Proc., § 527.6, subds. (c), (d), italics added.)

■ Under fundamental rules of statutory construction, our duty is to ascertain the intent of the Legislature in order to effectuate the purpose of the law; to give the provision at issue a reasonable and commonsense interpretation consistent with that apparent purpose; to give significance, insofar as is possible, to every word or part, harmonizing particular clauses by considering them in the context of the whole; to take public policy into account; and to give great weight to consistent administrative construction. (7 Witkin, Summary of Cal. Law (9th ed. 1988) Constitutional Law, § 94, pp. 146-147; see *Granberry* v. *Islay Investments* (1984) 161 Cal.App.3d 382, 388 [207 Cal.Rptr. 652]; *DeYoung* v. *City of San Diego* (1983) 147 Cal.App.3d 11, 17 [194 Cal.Rptr. 722].)[5]

■ In accordance with these principles, we conclude that Code of Civil Procedure section 527.6 must be interpreted as setting forth a procedure for what is in effect a highly expedited lawsuit on the issue of harassment. Although an initial temporary restraining order may be obtained ex parte on affidavit, the statute requires a more formal procedure for obtaining what approximates a permanent injunction.

This more formal procedure is required by due process. The injunction issued under the statute at issue is quite different from the kind of injunction issued under Code of Civil Procedure section 527, subdivision (a). Although the latter *preliminary* injunction may be issued on the basis of affidavit alone, the enjoined party still has the safeguard of a full trial on the merits to follow, which must, in accordance with the express dictate of the statute, be set "at the earliest possible date," taking precedence of all other cases except those of the same character or those to which special precedence is given by law. (Code Civ. Proc., § 527, subd. (a).)

In contrast, the procedure for issuance of an injunction prohibiting harassment is self-contained. There is no full trial on the merits to follow the issuance of the injunction after the hearing provided by Code of Civil Procedure section 527.6, subdivision (d). That hearing therefore provides

---

[5] In this respect, we take judicial notice of the fact that the Judicial Council's instructions for litigants in harassment actions under Code of Civil Procedure section 527.6 specifically state that "[i]f there are any witnesses to the defendant's conduct or [plaintiff's] emotional distress they should also be there" at the hearing, and that if the defendant wishes to oppose "the lawsuit," and he or she has any witnesses, "they must also be present." (Judicial Council of California, Instructions for Lawsuits to Prohibit Harassment (Code Civ. Proc., § 527.6) (rev. Jan. 1, 1987).)

the only forum the defendant in a harassment proceeding will have to present his or her case. To limit a defendant's right to present evidence and cross-examine as respondents would have us do would run the real risk of denying such a defendant's due process rights, and would open the entire harassment procedure to the possibility of successful constitutional challenge on such grounds.[6]

Thus, if it is offered, relevant oral testimony must be taken from available witnesses, and the trial court cannot issue an injunction unless it finds, by clear and convincing evidence, that unlawful harassment already exists in fact. The trial court failed to do that in this case; the injunction was therefore improperly issued.

In view of our decision, we need not address the constitutional issues raised by appellant.

The judgment is reversed. Respondents shall pay appellants' costs on appeal.

Barry-Deal, J., and Strankman, J., concurred.

A petition for a rehearing was denied February 23, 1989, and the opinion was modified to read as printed above.

---

[6] We do not hold, nor do we mean to imply, that every proceeding for an injunction under Code of Civil Procedure section 527.6, subdivision (d), must in all instances proceed with oral testimony instead of upon affidavits or declarations, regardless of the circumstances. Certainly, a full-fledged evidentiary hearing with oral testimony from all sides may not be necessary in all cases. (Cf. *Continental Baking Co.* v. *Katz* (1968) 68 Cal.2d 512, 524 [67 Cal.Rptr. 761, 439 P.2d 889]; *E. H. Renzel Co.* v. *Warehousemen's Union* (1940) 16 Cal.2d 369, 370-371 [106 P.2d 1]; *City and County of San Francisco* v. *Evankovich* (1977) 69 Cal.App.3d 41, 55 [137 Cal.Rptr. 883]; 6 Witkin, Cal. Procedure (3d ed. 1985) Provisional Remedies, § 309, at pp. 262-263.) We do hold, under the express language of the statute and in accordance with the requirements of due process, that the trial court in a harassment proceeding may not arbitrarily limit the evidence presented to written testimony only, when relevant oral testimony is offered. Both sides may offer evidence by deposition, affidavit, or oral testimony, and the court *shall receive* such evidence, subject only to such reasonable limitations as are necessary to conserve the expeditious nature of the harassment procedure set forth by Code of Civil Procedure section 527.6.