95 Cal.Rptr.2d 676 (2000)
80 Cal.App.4th 853
CABINDA LLC, Plaintiff and Respondent,
v.
SANTA MONICA RENT CONTROL BOARD, Defendant and Appellant.
No. B133077.
Court of Appeal, Second District, Division Four.
May 11, 2000.
Ordered Not Officially Published August 23, 2000.[*]
*678 Doris Ganga, General Counsel, Santa Monica Rent Control Board; Caldwell, Leslie, Newcombe & Pettit, David Pettit and Lisa Gordon, Los Angeles, for Defendant and Appellant.
Law Offices of Gordon P. Gitlen and Gordon P. Gitlen, Santa Monica, for Plaintiff and Respondent.
*677 EPSTEIN, J.
The determinative question in this case is whether regulations adopted by the Santa Monica Rent Control Board governing vacancy decontrol are preempted by the Costa-Hawkins Rental Housing Act. We agree with the trial court's conclusion that they are and affirm the order.

FACTUAL AND PROCEDURAL SUMMARY

Regulatory Background
The City of Santa Monica has had a system of residential rent control in place since 1979. The Santa Monica Rent Control Charter Amendment (the Rent Control Law) is administered by an elected Rent Control Board (the Board). In addition to regulating permissible increases in rents, the Rent Control Law protected tenants from the removal of controlled rental units from the housing market, required just cause for eviction from a controlled rental unit, and provided that rents would remain controlled after a tenant vacated his or her unit.
*679 In 1995, the Legislature enacted the Costa-Hawkins Rental Housing Act (Civ. Code, § 1954.50,[1] et seq., (Costa-Hawkins)), which provides for vacancy decontrol of rental rates, whether or not the rental property is subject to rent control. Under Costa-Hawkins, effective January 1, 1999, a landlord may establish the initial and subsequent rental rates for new tenancies in a rental unit subject to rent control. (§ 1954.52, subd. (a)(3).)
During an interim period, from January 1, 1996 to December 31, 1998, Costa-Hawkins provided for limited vacancy decontrol in rent controlled units: "Where the previous tenant has voluntarily vacated, abandoned, or been evicted pursuant to paragraph (2) of Section 1161 of Code of Civil Procedure, an owner of residential real property may, no more than twice, establish the initial rental rate for a dwelling or unit in an amount that is no greater than 15 percent more than the rental rate in effect for the immediately preceding tenancy or in an amount that is 70 percent of the prevailing market rent for comparable units, whichever amount is greater." (§ 1954.53, subd. (c).)
Subsequent to the enactment of Costa-Hawkins, but prior to its effective date, Santa Monica's Board adopted regulations to address the interim period. Santa Monica Rent Control Board regulation 3301, subdivision (g)[2] defines voluntary and involuntary vacancies, for purposes of determining if a vacancy is voluntary within the meaning of Costa-Hawkins.
Regulation 3301, subdivision (g)(1) defines "voluntary" as "the tenant's independent choice, without intimidation, pressure, or harassment." Subdivision (g)(2)(a) describes non-voluntary vacancy: "A vacancy resulting from harassment, threats to withdraw the property from the rental market pursuant to the Ellis Act, or notices of any kind that negligently or intentionally misrepresent to the tenant that he or she is required to vacate the controlled unit shall not be considered voluntary." Harassment is defined in subdivisions (g)(2)(b) and (g)(2)(c).
Subdivision (g)(2)(e) establishes a presumption of a sham tenancy: "A tenancy and subsequent vacancy created as a sham shall not be considered voluntary. A sham tenancy may be presumed where the occupant did not have a bona fide landlord-tenant relationship with the landlord, or occupied the property for less than four (4) months and principally for the purpose of vacating the property to establish eligibility for vacancy-related increase." (Reg. 3301, subd. (g)(2)(e).)
Subdivision (m) requires a landlord to re-register a vacated unit with the Board within 30 days after the re-rental of the unit and the establishment of a new maximum allowable rent. Re-registration must be on a form provided by the Board, and must include the dates of the vacancy and re-rental, the reason for the vacancy, the name of the vacating tenants, and the rental rate for the new tenancy. The landlord may also provide additional information, including documentary evidence in support of statements made on the re-registration form, the address and telephone number of vacating tenants, the names of the new tenants, and the rental rate in effect for the immediately preceding tenancy. (Reg. 3301, subd. (m)(2) and (3).)
Regulation 13008 establishes a procedure to resolve disputes which may arise when a landlord re-registers a unit after setting a new maximum allowable rent following a voluntary vacancy. It contains the same re-registration requirements set out in regulation 3301, subdivision (m), and then provides: "Absent a showing of misrepresentation or fraud, within ninety (90) days after the landlord files a re-registration, if a question of fact arises regarding *680 the correct registered rent, the landlord and current tenant will be notified in writing that a factual dispute exists and will be allowed ten (10) days in which to provide additional information regarding the correct [maximum allowable rent]. If no response is filed within the ten-day time limitation, the [maximum allowable rent] will remain unchanged." (Reg.13008, subd. (c).)
If a timely response is received from the landlord or the current tenant, the Board will attempt to resolve the dispute informally. If the informal process fails, "any landlord, current tenant, or the Board Administrator may petition for a hearing to establish the correct rent" pursuant to Costa-Hawkins and regulation 3301. (Reg.13008, subd. (c)(2).) If no petition is filed within 30 days of the notification by the Board that a question of fact still exists as to the lawful MAR, the Board's official records will reflect the maximum allowable rent as set out in the Board's notice. (Reg.13008, subd. (d).) Where a petition is filed, a hearing will be set. "Any party to a hearing under this subsection shall have the right to introduce into the record any relevant evidence regarding the establishment of the rental rate and the correct rent level. The hearing officer to whom the case is assigned shall have the affirmative duty to seek and introduce into the record all available evidence regarding the establishment of the rental rate and the correct rent level." (Reg. 13008, subd. (f).) This case arose from this statutory and regulatory scheme.

Factual Summary
In January 1997, Cabinda LLC became the owner of a 20-unit apartment complex in Santa Monica which is subject to the Rent Control Law. In March and April 1997, and pursuant to regulation 3301, subdivision (m), Cabinda filed vacancy increase registration forms with the Board for three of the units. On the form for Unit 109, Cabinda stated the tenancy began on February 1, 1997, and became vacant on an unknown date, due to abandonment by the tenant. On the form for Unit 110, Cabinda stated that the tenancy began on January 12, 1997 and ended on March 8, 1997, due to the tenant's voluntary termination of the tenancy. On the form for Unit 105, Cabinda stated the tenancy began on January 10, 1997 and ended on March 19, 1997, due to the tenant's voluntary termination of the tenancy.
In October 1997, the administrator of the Board sent Cabinda a notice of improper registration of vacancy increases as to six of its units, including Units 105, 109 and 110. The notice stated that "Regulation 3201(g)(2)(e) [sic] provides that a tenancy of less than four (4) months will be considered a sham. It does not appear that qualifying vacancies have occurred. In each unit, the vacating tenant occupied the unit for less than 4 months. [¶] Based on these facts, it appears that you are not entitled under the law to implement the vacancy related rent increase. If you disagree with this analysis, you may wish to submit additional information to us regarding your right to the rent increase. We will not adjust the maximum allowable rent in our records pending further contact from you." Cabinda was given 10 days to submit additional information in writing to rebut the administrator's analysis.
In a letter dated October 11, 1997, Cabinda provided additional information to the Board. Cabinda explained that it purchased the building, which contains 16 singles and 4 one-bedroom units, in January 1997. The building suffers from excessive noise both from traffic and from a parking lot which serves a 24-hour business. Cabinda believed the high rate of turnover in the building is primarily caused by the noise problem. The building averages two vacancies per month. Cabinda described the circumstances specific to the vacancies in each of the units questioned by the Board.
According to a November 20, 1997 letter from the Board, Cabinda failed to respond *681 to the Board's request for documentation, such as rental agreements and security deposit records, to support its contention that the vacancies were voluntary. Based on the information before it, the Board stated it was unable to resolve the factual dispute. Cabinda was advised that it had the right to petition for a hearing to establish the correct rent, pursuant to regulation 13008. In the absence of a petition for a hearing, the Board's determination of the maximum allowable rents, which did not include the 15 percent increases, would become final.
In response to this letter, Cabinda filed petitions for determination of correct maximum allowable rent, pursuant to regulation 13008, as to Units 105, 109 and 110. Just a few days later, Cabinda sent a letter to the Board requesting instead a rent certification as required by section 1947.8, subdivision (c) of the Petris Act.[3] Cabinda asked that its petitions for determination of maximum allowable rent, filed pursuant to regulation 13008, be withdrawn.
The Board formalized the withdrawal of the petitions. It then issued a verification of maximum allowable rent pursuant to regulation 13007 and section 1947.8. The maximum allowable rents did not include the vacancy increases registered by Cabinda.
Cabinda then filed an appeal of the rent certification with the Board. It asserted that the maximum allowable rent levels were incorrect because they did not include rent increases allowed by Costa-Hawkins. It also asserted that the Board was without authority to place additional restrictions on rent increases authorized by Costa-Hawkins. Cabinda asked that the rent levels be certified at the levels it sought in its registration. The Board affirmed the administrator's decision as to the maximum allowable rent for Units 105, 109, and 110.
On June 18, 1998, Cabinda filed a vacancy increase registration for Unit 210, stating the tenancy began in September 1996 and ended on May 31, 1998, due to the tenant's voluntary termination of the tenancy. On July 30, the Board notified Cabinda that the increase in maximum allowable rent appeared to be unauthorized: "The form you submitted indicates that the previous tenant voluntarily vacated on May 31, 1998. However, this tenant contacted the Rent Control Agency and informed staff that she was a victim of ongoing harassment. Specifically, you had served her with two, 3-Day Notices (for reasons other than nonpayment of rent); that you opposed her economic hardship status with respect to the rent increase authorized by increase petition 1-1430; and, she believed you took these actions in retaliation because she had this unit cited by the Health Department (2/13/97)." Cabinda did not submit additional information to the Board, and the board's determination that the unit was not eligible for the registered rent increase became final.
Cabinda then filed a petition for writ of mandate in superior court. The first cause of action, for traditional mandate (Code Civ. Proc, § 1085), asserted that the Board denied Cabinda its rights under Costa-Hawkins to establish new initial rental rates between vacancies by refusing to adjust its records of lawful rent levels. The petition also asserted causes of action for administrative mandamus (Code Civ. Proc, § 1094.5), and for declaratory and injunctive relief.
The trial court granted the petition for writ of mandate, finding that the Board's regulation 3301, particularly subdivision (g), and regulation 13008, are preempted by Costa-Hawkins and facially invalid. The Board appeals from this order.

DISCUSSION
Appellant claims the court erred as a matter of law in finding that regulations *682 3301 and 13008 are preempted by Costa-Hawkins.[4]
The general principles governing preemption analysis are collected in Sherwin-Williams Co. v. City of Los Angeles (1993) 4 Cal.4th 893, 16 Cal.Rptr.2d 215, 844 P.2d 534. If an otherwise valid local law conflicts with general law, it is preempted by the general law and therefore void. A conflict exists if the local legislation duplicates, contradicts, or enters an area fully occupied by the general law, either expressly or by implication. Local legislation duplicates general law when it is coextensive with it. Local legislation is contradictory to general law when it is inimical to it. (Id. at pp. 897-898, 16 Cal.Rptr.2d 215, 844 P.2d 534.) "Finally, local legislation enters an area that is `fully occupied' by general law when the Legislature has expressly manifested its intent to `fully occupy' the area [citation], or when it has impliedly done so in light of one of the following indicia of intent: `(1) the subject matter has been so fully and completely covered by general law as to clearly indicate that it has become exclusively a matter of state concern; (2) the subject matter has been partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action; or (3) the subject matter has been partially covered by general law, and the subject is of such a nature that the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the' locality. [Citations.]" (Sherwin-Williams, supra, 4 Cal.4th at p. 898, 16 Cal.Rptr.2d 215, 844 P.2d 534.)
Appellant argues that its regulations do not duplicate the Costa-Hawkins provisions, that there is no conflict between its regulations and Costa-Hawkins, and that there is no basis to find that the Legislature intended that Costa-Hawkins would fully occupy the field of rent control or vacancy decontrol. We find the third issue determinative, and limit our discussion accordingly.
The goal of the Costa-Hawkins Rental Housing Act is to give owners of residential real property the right to establish the initial and all subsequent rental rates for vacant units in their rental properties. (See § 1954.52, subd. (a).) The Legislature expressly extended this right to owners of properties "whose initial or subsequent rental rates are controlled by an ordinance or charter provision in effect on January 1, 1995, ..."(§ 1954.52, subd. (a)(3)(A), (B), (Q.)
Further explanation is found in the Legislative Counsel's Digest: "(1) Under existing law, the rent for a hiring of real property is determined by contract of the parties in the absence of governmental regulation. Various local governmental entities within the state have enacted ordinances or other measures that establish maximum rents for the hiring of real property for residential use. [¶] This bill would provide that, notwithstanding any other provision of law, an owner, as defined, of residential real property, as defined, may establish the initial and all subsequent rental rates for a dwelling or a unit that has a certificate of occupancy issued after February 1, 1995, that has already been exempt from the residential rent control ordinance of a public entity on *683 or before February 1, 1995, pursuant to a local exemption for newly constructed units, ... The bill would also provide that, notwithstanding any other provision of law, an owner of residential real property may establish the initial rental rate for a dwelling or unit, except under specified conditions. The bill would also make various technical and conforming changes to statutes relating to rent control." (Legis. Counsel's Dig., Assem. Bill No. 1164 (1995-1996 Reg. Sess.))
The area the Legislature intended to cover by Costa-Hawkins is limited: it is the right of landlords to establish rental rates for their property, whether or not the property is subject to rent control. The question is how fully the Legislature intended to occupy this field.
Costa-Hawkins states the basic rule of law, that owners of residential property may establish the initial and subsequent rental rates for a dwelling. But it also specifies exceptions to this authority, where the owner has otherwise agreed by contract with a public entity (§ 1954.52, subd. (b)); where the rental property "contains serious health, safety, fire, or building code violations, ... for which a citation has been issued by the appropriate governmental agency and which has remained unabated for six months or longer preceding the vacancy" (§ 1954.52, subd. (d)); and where the owner gives notice of termination of a month to month tenancy pursuant to section 1946 or terminates based on a change in the terms of the tenancy pursuant to section 827. (§ 1954.53, subd. (a)(1).)
Costa-Hawkins sets up a separate method for gradual implementation of owner-established rental rates for properties that have been subject to rent control by limiting the right to increases during an interim period between January 1, 1995 and January 1, 1999. Under section 1954.53, subdivision (c), an owner of rent controlled property may implement up to two 15-percent rent increases during the interim period, but only "[w]here the previous tenant has voluntarily vacated, abandoned, or been evicted pursuant to paragraph (2) of Section 1161 of Code of Civil Procedure,...."
The Legislature has granted to owners the right to establish rental rates, excepted certain properties entirely from that right, and limited the speed with which that right may be exercised as to rent controlled properties. This is a comprehensive treatment of the field of decontrol of residential rental rates, indicating the Legislature's intent to fully occupy the field.
Appellant argues against this conclusion on two theories. First, it claims the Legislature could not have intended to fully occupy the field because it provided only undefined terms in addressing qualifying vacancies during the interim period. What concerns appellant is the absence of any definition of what constitutes a voluntary vacancy for purposes of the interim increase. This is not a term which requires additional definition in this context.
Appellant is not really challenging the clarity of the word "vacancy." Its claim is that the word "voluntary" requires definition. Black's Law Dictionary defines "voluntary" as "[unconstrained by interference; unimpelled by another's influence; spontaneous; acting of oneself. [Citation.] Done by design or intention. Proceeding from the free and unrestrained will of the person. Produced in or by an act of choice. Resulting from free choice, without compulsion or solicitation." (Black's Law Diet. (6th ed.1990) p. 1575, col. 1.) Notably the definition in the legal dictionary is fully consistent with the Webster's definition (Webster's 3d New Internat. Diet. (1993) p. 2564), and with the common usage of the word. The Legislature had no need to further define the phrase "voluntary vacancy" because the meaning of the phrase is readily understood.
Appellant also argues that the Legislature could not have intended to fully occupy *684 the field because it specifically preserved the authority of local entities to regulate or monitor evictions and health or safety code violations. We reach the opposite conclusion.
Section 1954.53, subdivision (e) provides: "Nothing in this section shall be construed to affect any authority of a public entity that may otherwise exist to regulate or monitor the grounds for eviction." (See also § 1954.52, subd. (c).)
Section 1954.53, subdivision (f) provides: "This section shall not apply to any dwelling or unit if all the following conditions are met: [¶] (1) The dwelling or unit has been cited in an inspection report by the appropriate governmental agency as containing serious health, safety, fire, or building code violations, as defined by Section 17920.3 of the Health and Safety Code, excluding any violation caused by a disaster. [¶] (2) The citation was issued at least 60 days prior to the date of the vacancy. [¶] (3) The cited violation had not been abated when the prior tenant vacated and had remained unabated for 60 days or for a longer period of time. However, the 60-day time period may be extended by the appropriate governmental agency that issued the citation." (See also § 1954.52, subd. (d).)
These provisions demonstrate the Legislature's desire to preserve to local government and other local entities particular aspects of regulatory oversight, while occupying the remainder of the field itself. Thus, the Legislature did not preserve to local government or its agency the authority to approve or disapprove the amount of a new rental rate contained on an owner's registration form following a vacancy. In fact, the only information a local agency can require an owner to provide as part of the agency's monitoring or regulating of evictions pursuant to section 1954.53, subdivision (e) is the name of the former and present tenants. (§ 1947.7, subd. (g).) This limitation further indicates that the Legislature did not intend to preserve an oversight role for the local agency when owners implemented rent increases pursuant to Costa-Hawkins. Regulation 3301, subdivision (m) requires the owner to provide more information upon re-registration of a unit after a vacancy. The same information is required under regulation 13008, subdivision (b). That aspect of the Board's regulations is in conflict with section 1947.7, subdivision (g) of the Petris Act.
This case is similar to Mobile-park West Homeowners Assn. v. Escondido Mobilepark West (1995) 35 Cal.App.4th 32, 41 Cal.Rptr.2d 393. In Mobilepark, the City Council of Escondido enacted an ordinance which purported to clarify and implement a portion of a state law which exempted certain leases from rent control. The court found that the state law set standards for exempting certain leases from rent control, and the local government was preempted from imposing further requirements on owners in order to qualify for the exemption. (35 Cal.App.4th at pp. 46-47, 41 Cal.Rptr.2d 393.) Not only did the court find that the state law fully occupied the area of exempting leases from local rent control laws. It also found that by adding standards for an owner to qualify for the exemption, the local ordinance was inimical to the terms of the state law. Both factors supported the court's conclusion that the local ordinance was preempted by state law. (Ibid.)
In our case, the state law authorizes owners to set rental rates, and in the case of rent controlled properties during the interim period, to implement a 15 percent rent increase following a voluntary vacancy, abandonment, or eviction for failure to pay rent. Santa Monica's regulation 3301, subdivision (g)(1) defines "voluntary vacancy" in terms which are generally consistent with the dictionary definitions we quoted. But subdivision (g)(2) then defines "nonvoluntary vacancy" with examples of conduct which find no support in Costa-Hawkins. These examples include threats to withdraw the property from the rental market, reduction in housing services or *685 maintenance, abuse of the landlord's right of access into a unit, and the presumption of a sham tenancy where the prior tenancy lasted for less than four months. Application of these additional prohibitions may preclude rent increases otherwise permitted under Costa-Hawkins. For that reason, regulation 3301, subdivision (g) is inimical to the state law and for that reason is preempted. (See Mobilepark West Homeowners Assn. v. Escondido Mobilepark West, supra, 35 Cal.App.4th at p. 46, 41 Cal.Rptr.2d 393.)
The regulation not only set up additional criteria in order for an owner to utilize the authority granted by Costa-Hawkins, it also gave to the Board the power to challenge an owner's vacancy rent increase "if a question of fact arises" regarding the correct registered rent, and places on the owner the burden to prove to the Board that the vacancy was a qualifying vacancy. (Reg. 13008.) Costa-Hawkins does not preserve any such authority to the Board. It gives owners the authority to establish rents, with specific exceptions and guidelines.
The Board does continue to have authority, pursuant to section 1947.7 of the Petris Act, to require owners to register the amount of rent being charged for their properties. But subdivision (f) of that section provides: "Nothing in this section shall be construed to grant to any public entity any power which it does not possess independent of this section to control or establish a system of control on the price at which accommodations may be offered for rent or lease, or to diminish any power to do so which that public entity may possess, except as specifically provided in this section."
A state law such as Costa-Hawkins, which fully occupies an area, is to apply in the same manner in all jurisdictions in the state. If local government were permitted to adopt regulations defining a preemptive state law and establishing presumptions of violation, chaos would result. The state law would mean something different depending on the location of its application. The preemption doctrine is designed to avoid that result.[5]
We conclude, as did the trial court, that regulations 3301 and 13008 are preempted by the Costa-Hawkins Rental Housing Act.
Appellant argues that the trial court's order was impermissibly overbroad in ordering that it "cease and desist use of its Regulations number 3301(g) and 13008." It claims it was prejudiced because the order, read literally, precludes the Board from use of regulation 13008, subdivision (b), which requires registration of new rent levels following an increase after a vacancy. Without this information, appellant claims, it cannot certify rents as required under the Petris Act. As we have explained, the information the Board can require for registration under the Petris Act is limited to the tenant's name; any additional information may be requested, but not required. (§ 1947.7, subd. (g).) Regulations 13008, subdivision (b), and 3301, subdivision (m) go beyond the statutory limitation. The trial court properly barred the Board from enforcing those regulations. The solution to the problem is for the Board to adopt a regulation which does not trespass on the scope of the general state law.

*686 DISPOSITION
The order is affirmed.
CHARLES S. VOGEL, P.J., and CURRY, J., concur.
NOTES
[*] The Supreme Court ordered that the opinion be not officially published. (See California Rules of Court, Rules 976 and 977.)
[1] All statutory references are to the Civil Code unless otherwise indicated.
[2] All references to regulations are to the regulations of the Santa Monica Rent Control Board, unless otherwise indicated.
[3] The Petris Act requires that rent control jurisdictions with rent registration requirements certify permissible rent levels for a rent controlled unit within strict timelines. (§ 1947.7 et seq.)
[4] Although it did not move to dismiss this appeal, appellant argues the case is now moot based on vacancies and rent increases in three of the four units, and the repeal of the sham tenancy portion of regulation 3301. We are not convinced that the issues raised in this case are all moot, given the scope of the remaining regulations and the fact that respondent still has one tenant in place from the interim period. More importantly, this court has the discretion to resolve a matter of continuing public interest, where the issue is likely to recur, despite the occurrence of an event during the pendency of the appeal which would normally render the matter moot. (See Schraer v. Berkeley Property Owners' Assn. (1989) 207 Cal.App.3d 719, 728, 255 Cal.Rptr. 453.) We find this an appropriate case for the exercise of that discretion, and decline to dismiss the appeal.
[5] Appellant responds there is no danger in permitting local regulation of matters involving landlord-tenant relations, noting this has occurred with rent control and eviction defenses. But the constitutional authority for local regulation is limited. Under article 11, section 7, "A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." (Italics added.) When the Supreme Court recognized the right of a local government to enact rent control measures, it did so because general state law did not then preempt the field of maximum limits on residential rents. (Birkenfeld v. City of Berkeley (1976) 17 Cal.3d 129, 140, 130 Cal.Rptr. 465, 550 P.2d 1001.)