Filed 4/27/16  Densmore v. McCarron CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| MARTHA DENSMORE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>NANCY DUFFY MCCARRON,<br><br>    Defendant and Appellant. | 2d Civil No. B267792<br>(Super. Ct. No. 15CV01036)<br>(Santa Barbara County) |

Nancy Duffy McCarron appeals the trial court's grant of a civil harassment restraining order in favor of her neighbor, Martha Densmore.  McCarron contends it was reversible error (1) to grant Densmore a temporary restraining order (TRO), (2) to deny McCarron's request to compel certain discovery and (3) to issue a restraining order where the elements of harassment were not met.  We dismiss the appeal from the TRO as moot.  Otherwise, we affirm.

FACTS AND PROCEDURAL HISTORY

Densmore and McCarron are neighbors on the same street in Santa Barbara.  They have an ongoing dispute over the height of the trees in Densmore's yard.  On May 1, 2015, Densmore was in her upstairs bedroom speaking with her son on the telephone about her mother's health issues when she heard someone knocking on the

front door. She continued the conversation with her son and did not answer the door. According to Densmore, the loud knocking continued.

A short while later, McCarron went to the back of the house and climbed the stairs leading to the upper back patio outside of Densmore's bedroom. Densmore got off the telephone, telling her son, "This is bad. I've got to go." She then opened the patio door to see what McCarron wanted. McCarron, who appeared angry, asked for Densmore's ex-husband, Junichi Shimizu, and said "'[y]ou're ruining my marriage.'" Densmore responded, "Nancy, I can't help you. This isn't my house."

As the situation started to escalate, Densmore told McCarron she would have to leave. McCarron became defiant, and Densmore said she would meet McCarron in front of the house on the street. McCarron responded, "The street? The street?" Densmore again instructed McCarron to leave the property. She refused. At that point, Densmore felt threatened by McCarron's hostile behavior. She shut and locked her bedroom door as well as the other exterior doors in the house. While locking the doors, she noticed McCarron's face in one of the windows.

When Densmore returned to her bedroom, she saw that McCarron was sitting in a lounge chair on the lower deck with her arms crossed. Once again, Densmore instructed McCarron to leave the property. When McCarron refused, Densmore told her to communicate with Shimizu through the mail.

Densmore called 911 and told the dispatcher what was happening. She also called Shimizu and informed him McCarron was on the property and refused to leave. The two telephone calls took about 15 minutes. Densmore was upset, agitated, nervous and unsettled.

No sooner had McCarron left, then she called Densmore and asked for Shimizu's cell phone number. Densmore refused to give it to her and hung up. On May 7, 2015, McCarron called Shimizu, who hung up on her because she sounded angry and was speaking loudly. McCarron called back and left a voice mail stating that if he

2

and Densmore did not cut their trees, McCarron would come onto the property and cut them herself.

Densmore filed a report with the police after the May 1 encounter. She said she was afraid of McCarron because she seemed "out of control" and because McCarron had a long-standing dispute with Shimizu regarding the trees. The situation caused her significant stress and affected her sleep.

McCarron admitted that, when no one answered the front door, she went into Densmore's backyard. She said she thought Shimizu might be in the backyard gardening. According to McCarron, Densmore told her to go to the front deck and wait for her there. Fifteen minutes later, Densmore reappeared and told McCarron to "get the fuck off my property and don't ever come back." McCarron said she told Densmore she would leave and never come back.

On May 15, 2015, Densmore filed a request for a civil harassment restraining order on behalf of herself and Shimizu. A few days later, the trial court issued a TRO prohibiting McCarron from contacting Densmore and Shimizu.

McCarron, who is an attorney, appeared in propria persona. She moved to compel responses to certain discovery requests. When the motion was heard, McCarron informed the trial court that the discovery issues "had been narrowly focused to just a few things." The court ruled on those specific issues and scheduled a contested hearing.

Densmore, Shimizu, McCarron and McCarron's husband, Timothy, testified at the hearing. The trial court found Densmore's "testimony credible as she described [McCarron] repeatedly hammering on the door, then circling to the back of the house where she could see in [Densmore's] bedroom, being told several times to leave the property, and defiantly refusing." The court noted "[t]he record may not reflect the pallor of [Densmore], her quavering voice and shaking hands, but her distress in reliving the incident was clear to the Court."

In contrast, the trial court did not find McCarron's testimony credible. It stated: "Lending credence to the testimony of [Densmore and Shimizu] was

3

[McCarron's] behavior in the courtroom. The Court admonished [her] a number of times, including several specific admonitions to cease bringing up specific topics that the Court found irrelevant; however, [McCarron] did not comply. She regularly interrupted; the record may not adequately reflect the tone and volume of her voice, her argumentative and accusative posture and demeanor, but the Court found [her] behavior in the courtroom consistent with the behavior alleged by [Densmore and Shimizu]."

The trial court granted the three-year restraining order requested by Densmore and ordered McCarron to pay $1,000 in attorney fees. It found that McCarron's behavior "was outrageous and could be anticipated to seriously disturb the peace of [Densmore] in her home, and, in fact, did disturb [Densmore]." It further found that "there is a reasonable probability that similar acts will be repeated, based on [McCarron's] unwillingness or inability to control her behavior in the presence of the Court." McCarron appeals.

## DISCUSSION

### *Challenge to TRO*

Code of Civil Procedure section 527.6[1] establishes a procedure for providing expedited injunctive relief to persons suffering harassment. (*Schraer v. Berkeley Property Owners' Assn.* (1989) 207 Cal.App.3d 719, 730.) A TRO may be obtained, with or without notice, upon an affidavit showing reasonable proof of harassment and that great or irreparable harm would result to the plaintiff. (§ 527.6, subd. (c).) The TRO generally lasts for not more than 22 days, within which time a hearing must be held on the petition for a permanent restraining order. (§ 527.6, subd. (d).) The restraining order shall issue, for a term of not more than three years, if the court finds unlawful harassment by clear and convincing evidence. (*Ibid.*)

McCarron contends the trial court improperly granted Densmore's request for a TRO. It is well established that a "TRO . . . terminates automatically when a permanent injunction is issued or denied." (*Landmark Holding Group, Inc. v. Superior*

_____

[1] All statutory references are to the Code of Civil Procedure.

*Court* (1987) 193 Cal.App.3d 525, 529.)  Thus, the trial court's grant of the restraining order terminated the TRO and, at the same time, mooted any appeal from the TRO. (*O'Kane v. Irvine* (1996) 47 Cal.App.4th 207, 210, fn. 4 ["[A]ppeal from the TRO, following the trial court's grant of the three-year restraining order, is moot"]; accord *People v. Gordon* (1951) 105 Cal.App.2d 711, 725; *Mailhes v. Investors Syndicate* (1934) 220 Cal. 735, 737).  We therefore dismiss this portion of McCarron's appeal.

*Motion to Compel Discovery Responses*

McCarron propounded form interrogatories, ten special interrogatories, three requests for admission and thirteen document requests.  Densmore did not respond to the form interrogatories, but responded to the other requests.  Dissatisfied with the responses, McCarron moved to compel further responses.  At the hearing on the motion, McCarron informed the trial court that the discovery issues raised in the motion "had been narrowly focused to just a few things."  McCarron then set forth on the record the issues she wished the court to address.  To the extent she raises other discovery issues in her briefs, those issues were waived in the trial court.[2]  (*Johnson v. Pratt & Whitney Canada, Inc.* (1994) 28 Cal.App.4th 613, 622, fn. 11; see *Cowan v. Superior Court* (1996) 14 Cal.4th 367, 371.)

We review discovery orders for an abuse of discretion.  (*Sauer v. Superior Court* (1987) 195 Cal.App.3d 213, 228.)  Discretion is abused only when it can be shown that the trial court has "exceed[ed] the bounds of reason, all of the circumstances before it being considered."  (*Loomis v. Loomis* (1960) 181 Cal.App.2d 345, 348; *Denham v. Superior Court* (1970) 2 Cal.3d 557, 566.)  McCarron has not met this burden.

First, McCarron contests Densmore's failure to respond to Form Interrogatory  No. 17, which required Densmore to state all facts supporting her denial of

_____

[2] Densmore contends that McCarron's arguments regarding the motion to compel are not properly before this court.  We disagree.  While it is true that a discovery order is not directly or immediately appealable, such an order is nonetheless reviewable on an appeal from the subsequent judgment.  (*County of Nevada v. Kinicki* (1980) 106 Cal.App.3d 357, 363; *Schaefer v. Manufacturers Bank* (1980) 104 Cal.App.3d 70, 74.)

the three requests for admission. Densmore objected to those requests as irrelevant because they sought information regarding Densmore's marital relationship with Shimizu and her ownership interest in the property. The trial court implicitly sustained those objections, noting that the action is based primarily on the events that occurred on May 1, 2015 and "whether [Densmore] owns the property or not" is irrelevant to those events. McCarron responded, "Okay. Well, okay. That's fine."

Second, McCarron challenges Densmore's failure to respond to Form Interrogatory No. 13, which requested any photographs, films or videotapes concerning the "incident." She claims that Densmore has a video surveillance camera pointed at her living room. Densmore's counsel explained that the camera was installed after May 1 and therefore has no relevance to the issues before the court. The trial court agreed and appropriately denied the motion to compel.

Third, McCarron contends Densmore improperly objected to her special interrogatories. Densmore objected to most of the requests as irrelevant. Special Interrogatory No. 3 asked Densmore to identify the neighbor who "agreed McCarron left the dog note on [Densmore's] car." After McCarron explained she wanted to call that neighbor as a witness, Densmore's counsel clarified that they were not seeking a restraining order based on that note and that no issues will be raised regarding the note. The trial court issued an order precluding any mention of the note at trial. McCarron responded, "Okay. That's good enough, your Honor."

The trial court also determined McCarron was not entitled to know whether Randy Tinney, the former owner of Shimizu's property, was involved in preparing the request for a restraining order. The court reiterated that it would be looking only at what actually occurred between the parties and that the "ex-owner's input, whether it exists or not, is [not] relevant to that."

Finally, McCarron argues that she was not provided with all the documents she requested. Densmore's counsel, however, made clear that they were providing all documents relevant to the issues before the trial court and that no other documents would

6

be introduced at the hearing.  McCarron has not shown that the trial court abused its discretion by failing to compel the production of additional documents or information. Nor has McCarron shown that the failure to receive such documents or information prejudiced her defense.

*Grant of Restraining Order*

McCarron contends there was insufficient evidence to support the trial court's grant of a civil harassment restraining order.  We disagree.

"The elements of unlawful harassment, as defined by the language in section 527.6, are as follows:  (1) 'a knowing and willful course of conduct' entailing a 'pattern' of  'a series of acts over a period of time, however short, evidencing a continuity of purpose'; (2) 'directed at a specific person'; (3) 'which seriously alarms, annoys, or harasses the person'; (4) 'which serves no legitimate purpose'; (5) which 'would cause a reasonable person to suffer substantial emotional distress' and 'actually cause[s] substantial emotional distress to the plaintiff'; and (6) which is not a '[c]onstitutionally protected activity.'"  (*Schild v. Rubin* (1991) 232 Cal.App.3d 755, 762 (*Schild*).)

"In assessing whether substantial evidence supports the requisite elements of willful harassment, as defined in . . . section 527.6, we review the evidence before the trial court in accordance with the customary rules of appellate review.  We resolve all factual conflicts and questions of credibility in favor of the prevailing party and indulge in all legitimate and reasonable inferences to uphold the finding of the trial court if it is supported by substantial evidence which is reasonable, credible and of solid value. [Citations.]"  (*Schild, supra,* 232 Cal.App.3d at p. 762; *Brekke v. Wills* (2005) 125 Cal.App.4th 1400, 1412.)

McCarron contends that her behavior on May 1 did not constitute a "course of conduct" sufficient to justify the issuance of a restraining order.  (See § 527.6, subd. (b)(3).)  To qualify as a course of conduct, there must be "a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose, including following or stalking an individual, making harassing telephone calls

7

to an individual, or sending harassing correspondence to an individual by any means." (§ 527.6 (b)(1).) The course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress. (*R.D. v. P.M.* (2011) 202 Cal.App.4th 181, 188; *Thomas v. Quintero* (2005) 126 Cal.App.4th 635, 662-663; *Ensworth v. Mullvain* (1990) 224 Cal.App.3d 1105, 1109.)

McCarron relies upon *Leydon v. Alexander* (1989) 212 Cal.App.3d 1, 4-5 (*Leydon*), in which the court held that a single incident of harassment was insufficient to meet the statutory requirement of a course of conduct. In that case, a former employee who had been terminated from his job sued the employer and then returned to the workplace eight years later and verbally abused his former supervisor in a five-minute confrontation. (*Id.* at pp. 3-4.) Other than that single incident, the only contact the former employee had had with the employer was via his lawsuit, a constitutionally protected activity. (*Id.* at pp. 4-5; see also *Scripps Health v. Marin* (1999) 72 Cal.App.4th 324, 333.)

Here, in contrast to *Leydon,* there was not a single, brief, isolated act, but rather a "series of acts over a period of time, however short, evidencing a continuity of purpose[.]" (§ 527.6, subd. (b)(1).) First, McCarron "repeatedly hammer[ed]" on Densmore's front door. When Densmore did not respond, McCarron walked to the back of the house and went upstairs to the patio outside Densmore's bedroom. After Densmore opened the door, McCarron angrily asked to speak with Shimizu and told Densmore that "'[y]ou're ruining my marriage.'" Densmore instructed McCarron to leave. McCarron refused and became increasingly hostile. She declined to meet Densmore in the street to discuss the situation, and again refused to leave the property. This frightened Densmore to the point where she locked all the exterior doors in the house. While doing so, she saw McCarron's face in one of the windows.

Densmore then sat down on a lounge chair on the lower deck. Once again, Densmore instructed McCarron to leave the property. When McCarron refused, Densmore called 911. She also called Shimizu. The telephone calls took about 15

8

minutes, and McCarron concedes she remained in the chair for about 15 minutes. The series of events took far longer than the five-minute encounter in *Leydon*.

Moreover, the harassment continued. Although she had been instructed to communicate with Shimizu by mail, McCarron called Densmore and asked for Shimizu's cell phone number. Densmore hung up on her. A few days later, McCarron left a threatening voice mail message stating that if Densmore and Shimizu did not cut their trees, McCarron would come onto the property and cut them herself. This evidence supports the trial court's conclusion that these acts demonstrated a continuity of purpose to seriously alarm, annoy or harass Densmore.

That there are cases in which persons have engaged in more egregious forms of harassment does not change the fact, as found by the trial court, that McCarron's conduct seriously alarmed, annoyed or harassed Densmore, served no legitimate purpose and caused Densmore substantial emotional distress. Densmore testified that she suffered severe distress and loss of sleep. The court observed that although "[t]he record may not reflect the pallor of [Densmore], her quavering voice and shaking hands . . . , her distress in reliving the incident was clear to the Court."

Lastly, we reject McCarron's suggestion that there was no evidence of a reasonable probability that the harassing conduct would be repeated in the future. Given the ongoing dispute over the trees, McCarron's conduct towards Densmore, their proximity as neighbors, and McCarron's antagonistic behavior during the hearing, the trial court reasonably concluded that, unless enjoined, McCarron would continue to annoy and harass Densmore. We have considered each of McCarron's arguments and find them unpersuasive.[3]

---

[3] Concurrent with her reply brief, McCarron filed a request for judicial notice and request to publish our opinion. We deny both requests. McCarron has not demonstrated that the documents accompanying the request for judicial notice are relevant to the appeal. Nor has she shown a basis for publishing the opinion. (See Cal. Rules of Court, rule 8.1105(c).)

## DISPOSITION

The judgment (restraining order) is affirmed. The appeal from the TRO is dismissed as moot. Respondent shall recover her costs on appeal.

<u>NOT TO BE PUBLISHED.</u>

PERREN, J.

We concur:

GILBERT, P. J.

YEGAN, J.

10

Denise Motter, Commissioner

Superior Court County of Santa Barbara

_____

Nancy Duffy McCarron, in pro per, for Defendant and Appellant.

Adam Pearlman, for Plaintiff and Respondent.