Filed 7/24/23  York v. Brambila CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| HANNA YORK, Plaintiff and Respondent, v. RODOLFO ALEJANDRO BRAMBILA, Defendant and Appellant. | F084380 (Super. Ct. No. 20CECG03562) **OPINION** |

APPEAL from an order of the Superior Court of Fresno County.  Mark E. Cullers, Judge.

Rodolfo Alejandro Brambila, in pro. per., for Defendant and Appellant.

Hanna York, in pro. per., for Plaintiff and Respondent.

-ooOoo-

Rodolfo Alejandro Brambila, a self-represented inmate at the Fresno County jail, appeals the trial court's grant of Hanna York's petition for a civil harassment restraining order against him under Code of Civil Procedure section 527.6.[1]  Brambila contends: (1) York is precluded from seeking a civil harassment restraining order because her

---

[1]     Undesignated statutory references are to the Code of Civil Procedure.

employer obtained a workplace violence restraining order based on the same conduct; (2) the trial court improperly denied his request to conduct discovery; (3) the trial court granted an excessive number of continuances; and (4) the restraining order was improperly issued as it is not supported by substantial evidence, the trial court improperly limited his cross-examination of York, and it is constitutionally overly broad. Finding no merit to Brambila's contentions, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

*The Petition for Civil Harassment Restraining Order*

On December 11, 2020, York, an instructor at Fresno City College, filed a request for a civil harassment restraining order seeking protection from Brambila, who was a student of hers. York sought to protect herself, her husband, and her then five- and three-year old daughters. In a declaration attached to the request, York asserted Brambila contacted her via text message on November 23, 2020, asking to meet her in person (the November 23 incident). When she informed him that she would not meet with him, he responded, "I'm about to do something drastic and you're the only person who can help me." York stopped communicating with him and when he did not get a response, Brambila texted she was "an okay teacher, but a horrible friend."

On December 1, 2020 (the December 1 incident), York was sitting at her dining room table when she noticed Brambila walking to her front door. York "was extremely surprised" because she had no idea how he knew where she lived. She ran to the door to make sure it was locked and stood there. She heard the security door open and a knock on the door. She did not answer or make a sound, but then noticed the doorknob jiggling and heard several more knocks. York asked Brambila to leave immediately. She told him he was not invited and it was inappropriate to come to her home. Brambila pleaded with her to open the door, saying he just wanted to talk to her. Once Brambila left and drove away, York ran to a neighbor's home to use their phone to call police, as hers was

2.

broken.  When the police showed up, they told her they could not do anything because Brambila had left.

On December 10, 2020 (the December 10 incident), York was in the shower when her husband told her Brambila's empty car was parked down the street.  Her husband went out to the front yard and called police dispatch, while York went into the backyard to check on her daughters.  Once outside, York noticed two wooden planks leaning against the gate that were out of place; she had a feeling something wasn't right.  As she walked toward the planks, Brambila came out from behind them, holding a handgun in his right hand.  York immediately started yelling for her husband and for Brambila to leave the yard.  After Brambila raised the gun and stepped toward her, York lunged at him to try to keep him from firing the gun or heading towards her daughters.  They began to tussle—when York pulled at the bandana Brambila was wearing across his face, he bit her hand and pushed her backward towards the ground.  They fell with York on her back and Brambila on top of her, pinning her wrist to the ground with his left hand while she was holding onto his bandana.

At that point, York's husband entered the backyard, but stopped when Brambila pointed the gun at him.  York pleaded with Brambila to leave.  Brambila kept saying he was not going to hurt her, but he was going to get justice.  A short time later, two neighbors showed up to intervene; they tried to get Brambila to leave, but he would not.  Brambila stayed on top of York until the police arrived and negotiated with him to drop his weapon and release her.  Brambila was arrested for assault with a firearm, kidnapping, false imprisonment with violence, criminal threat, stalking, and carrying a concealed and loaded firearm.  An emergency protective order was issued protecting York and her husband.  York sustained minor injuries—bruises and bite marks—due to Brambila's actions.

Before the December 10, 2020 incident, York told two Fresno City College deans of the developing situation; an investigation was pending, and the deans had reached out to Brambila.  York asserted she and Brambila were nothing more than teacher and student.  York requested personal conduct and stay away orders.

A temporary restraining order was issued on December 14, 2020, which protected York and her family from Brambila.  Brambila was ordered to stay away from them, their home and their jobs, workplaces, and schools.  A hearing was set for March 15, 2021.

*Continuances of the Hearing and the Requests for Admission*

Brambila submitted a request to personally attend the March 15, 2021 hearing, and asked that the hearing be continued to April 2021.  The trial court denied the transportation request but approved his appearance via CourtCall.  Brambila was not present at the March 15, 2021 hearing.  York also requested a continuance.  The trial court continued the hearing to April 26, 2021.

On April 20, 2021, York filed a witness list and exhibit list for the trial.  The exhibit list included three photos that were attached to York's request for civil harassment restraining order and text messages between York and Brambila.

On April 22, 2021, Brambila filed a proof of service which stated three sets of requests for admissions had been served on York's attorney by mail on April 17, 2021.  The requests, which were attached to the proof of service, were directed at York, her husband, and the neighbor referred to in York's declaration.  The next day, Brambila filed a request to continue the April 26, 2021 hearing because he was awaiting responses to the requests of admission.

According to the minute order of the April 26, 2021 hearing, which Brambila attended, the trial court granted a one-time extension to seek advisory counsel and continued the hearing to June 7, 2021.  On May 13, 2021, Brambila filed a witness list and a motion for judicial notice.

***Brambila's Response to the Request***

Brambila filed a response to York's petition on May 20, 2021, objecting to the requested orders. With respect to the December 10 incident, Brambila asserted he told York he just wanted to talk to her, and he never made any threats. Brambila claimed York lunged at him unprovoked, he bit her in self-defense, and he restrained her on the ground until police arrived to prevent her from assaulting him. He further claimed the children were not in the backyard during the attack.

Brambila stated York exaggerated the December 1 incident, as he simply went to York's home to talk to her, and he left when she refused to see him. Brambila knew where she lived because they had exchanged text and email messages, as well as correspondence on which she wrote her address. With respect to the text messages exchanged on November 23, Brambila claimed they texted each other on multiple occasions, he did not threaten York, and York misquoted the messages. Brambila contended the incidents failed to meet the statutory requirements for issuance of a civil harassment restraining order.

***The Motion to Strike and Further Continuances***

On June 1, 2021, Brambila filed a motion to strike portions of York's declaration that described the November 23 and December 1 incidents on the grounds they were irrelevant and immaterial as they did not show harassment as defined by section 527.6. Brambila examined each incident in isolation and asserted they did not constitute harassment as defined in section 527.6.

At the June 7, 2021 hearing, the trial court denied the motion to strike. Both York and Brambila requested a continuance of the restraining order hearing. York's attorney needed additional time to subpoena police reports, while Brambila's housing pod had been placed on quarantine due to Covid-19. The trial court granted the requests and continued the trial to September 20, 2021.

On June 10, 2021, Brambila filed an objection to the text message on York's exhibit list, stating he had not received a copy of the exhibit from York and the messages were irrelevant given his motion to strike the November 23 incident.

## *The Demurrer*

On September 16, 2021, Brambila filed a demurrer to York's petition. He asserted the action was "res judicata" as State Center Community College District (SCCCD) obtained a workplace violence restraining order against him based on the same three incidents, which included personal conduct and stay away orders and identified York and her family as protected persons (the SCCCD action). Brambila argued the SCCCD action barred York from seeking a civil harassment restraining order. Brambila asked the trial court to take judicial notice of documents in the SCCCD action, including the petition and workplace violence restraining order, which were attached to the request.

Brambila was unable to be transported to the September 20, 2021 hearing as the inmates were in quarantine due to Covid-19. Consequently, the trial court continued the hearing to December 6, 2021. Brambila subsequently filed a written objection to the three-month continuance, arguing there was not good cause for a continuance of that duration, and asked the court to set the hearing for the first week of November 2021.

## *The December 6, 2021 Hearing*

Brambila was personally present at the December 6, 2021 hearing. An attorney appearing for York's counsel requested a continuance because York's counsel was in an out-of-town jury trial. Over Brambila's objection, the trial court granted the request, found there was good cause for the prior continuances, and continued the hearing to February 14, 2022.

Brambila then mentioned the demurrer and accepted the trial court's offer to address it. Brambila argued York's petition could not proceed because a judgment was granted in March 2021 in the SCCCD action. The trial court overruled the demurrer,

explaining York was not prohibited from obtaining a personal restraining order because SCCCD and York obtained a workplace violence restraining order, as the workplace violence restraining order was applicable only to the employee's workplace, not her home, and courts have held an employee can seek her own order against harassment at her home under section 527.6, citing *City of Los Angeles v. Animal Defense League* (2006) 135 Cal.App.4th 606, 625–627.

### *The Motion for Sanctions*

On February 3, 2022, Brambila filed a motion for sanctions because York failed to produce electronic information he requested pursuant to section 1987. Brambila asserted he served York's attorney with a request to produce York at the December 6, 2021 hearing, and for her to bring electronically stored information in her possession and control, specifically Zoom class sessions for the Fall 2020 semester and a December 8, 2020 Zoom session with Dean Henderson, but she did not appear at the hearing or produce the information. Brambila asserted he invited York's attorney to meet and confer with him at the Fresno County jail, but he never appeared.

### *The Hearing*

The hearing on York's petition was continued from February 14, 2022, to April 25, 2022, because York tested positive for Covid-19 and Brambila was in Covid-19 quarantine at the jail. Brambila subsequently filed a written objection to the length of the continuance, arguing it was unreasonably long and an abuse of the court's discretion.

Brambila, York, and York's attorney were present at the April 25, 2022 hearing. The trial court first addressed Brambila's motion for sanctions. The trial court explained sanctions were inappropriate because there had not been a finding that York or her attorney misused the discovery process as defined in section 2023.010. After further argument from Brambila and York's attorney, the trial court stated there is "no discovery in a civil [harassment] case," and York and her attorney were not required to produce

anything for trial on Brambila's request.  The trial court asked Brambila if there was any discovery he had requested that he had not received.  Brambila responded, "the electronic information in the form of the Zoom meetings," which he said was relevant to York's credibility.  The trial court then stated it was going to deny the motion and proceed with the hearing.

Before beginning the hearing on York's petition, the trial court asked Brambila if he understood he had a right against self-incrimination and anything he said, "can and will be used against you and at any subsequent civil or criminal proceeding."  Brambila responded, "Yes, I do.  I do not intend to testify today."

York testified on her behalf.  Brambila was a student in her spring and fall 2020 voice classes.  York described the December 1 incident.  Brambila came to her front door, immediately opened the security screen, and tried her front door as he knocked on it.  She waited at the front door to see if he would leave, but when she realized he was not leaving, she stood closer to the window and asked him to leave.  York's children were home, but her husband wasn't.  York could not say how long the incident lasted as "it was very frightening," but she believed it was about 10 to 15 minutes.  York watched Brambila walk to his vehicle, which was parked two houses down, and get inside.  She believed Brambila was texting; she heard the phone buzz a couple times, but she couldn't see who it was because the screen was broken.  She saw Brambila get out of his car and walk toward her home, but she had closed the blinds to show she was not interested in talking to him.  Eventually he left of his own accord and York ran to the neighbor across the street to call the police.

York also described the December 10 incident.  Her husband left for work at about 8:00 a.m. and she got into the shower.  Within minutes, her husband came back inside and told her Brambila's vehicle, which she had described to him from the previous incident, was on the street and he was calling the police.  York continued getting ready

8.

for the day. York went outside at the request of one of her daughters; her daughters were jumping on their trampoline. York walked to the side of the house and saw several boards placed where the trash cans normally were that were in a "very odd position," which alerted her that something was not right.

York walked down the side of the house, as she feared for her children's protection and safety; she was concerned Brambila might be there due to the December 1 incident and because he was not in his car when her husband saw it. Brambila was at the end of the yard inside the gate. York thought, "[h]ow dare he be in my yard with my children." When Brambila stepped out toward her, she yanked down the bandana that was over his face and started yelling for him to leave the yard. Brambila "made very clear quickly that he had a weapon," as he pulled it out and pointed it in her general direction. York believed Brambila was going to kill her.

As Brambila came toward her, York felt very threatened with her children in the yard, although she did not know where they were because she never looked back. York was ready to defend her children and to keep him from getting near them. She believed her children witnessed some of the incident through the house's sliding glass door.

Brambila sought to keep his gun hand free and put his arm around her. York was clawing at his face when Brambila bit her. She was screaming for her husband to call the police. Her husband, who was in the front yard, came to the back gate, but it was locked from the inside. York was concerned he would be shot.

York and Brambila eventually ended up in the backyard where they fell to the ground, with York face up on her back. Brambila was pressing her right arm to the ground while she was holding onto his bandana, which was hanging around his neck. The gun was always visible to York in Brambila's right hand, which was gloved; he did not point it at her indefinitely, but he "kept it very present." Brambila was laying on top

9.

of her with his back on her.  York's husband came into the backyard through the garage and when he attempted to approach Brambila, Brambila raised the gun to him.

York heard a voice she did not recognize coming from the back door of her garage, which she found out later belonged to a neighbor.  Brambila was saying things like, "Oh, what time is it?" and that he was not invited to the final exam of the class.  The neighbor tried to engage Brambila and encouraged him to let her go, but he would not.  Brambila continued to sit on her and restrain her for almost 20 minutes until the police came into the backyard.

York identified three pictures taken of her directly after the incident, which were entered into evidence.  They showed the bite mark on her left thumb, and scrapes and grass on her right hand from Brambila pressing her hand into the ground for a long period of time.  She did not invite Brambila to her house on December 1 or 10, or consent to his behavior.  Even though it had been 14 months since the incident and Brambila was in custody, York feared him because he willingly came to her home when (1) she asked him not to come, (2) she previously expressed that she was not comfortable meeting with him in person, (3) she told him on December 1 she was not willing to engage with him in person at her home, and (4) he returned on December 10 with what she believed was "the intent to force [her] to have a conversation with him," with her using the word " 'conversation' sarcastically."

After his arrest, York learned from police that he had a "capture kit in his vehicle" and "was wearing supposedly homemade body armor."  A small hand-made ladder was found in the yard, which she assumed he used to get into the backyard.  York was asking for a civil restraining order against Brambila for the longest possible period because she feared him, and she wanted it to include her children and husband.

Brambila cross-examined York.  Brambila first asked about the December 1 incident.  The trial court sustained a relevancy objection to Brambila's question of

10.

whether it was normal for people to ring her doorbell unsolicited. York confirmed her testimony was that it was highly unusual for Brambila to knock on her door because she did not wish to meet with him at her home, and stated she conveyed that in the November 23 text conversation.

Text messages between Brambila and York from July 8, 2020, through December 1, 2020, were admitted into evidence. When Brambila asked her which text message showed she told him she did not want to talk to him at her home, York admitted she did not state that directly; rather, she clarified she would not talk to him in person unless she had an office and space for that. York read the November 23 text conversation into the record. Brambila wanted to talk to her in person, but York responded that she "cannot meet in person." She encouraged Brambila to talk to a counselor or doctor, but he did not want to because he wasn't sure they could help, and he didn't want to talk to strangers. York told him she felt "like what you're doing is pressuring me to do something I don't feel comfortable with, especially since you are my student and I work for an institution that asks me to follow certain steps to help students when they are in need." She told him, "I'll talk to you but I just can't meet."

York did not recall providing her address to Brambila. She confirmed she wrote him a letter around July 7, 2020, to return a check and the envelope had her return address on it, though she did not recall if it was her home address. York's attorney interjected that he did not see the nexus between sending an address in the mail and an invitation to come to your home. The trial court made clear it was "not concerned with what happened on December 1st," and it was "more concerned about what happened on December 10th." While York's attorney objected to the letter as an exhibit, the trial court stated what happened on December 1 was "of no moment" as much as what occurred on December 10. Brambila asserted he was merely using the letter to show she provided him with her address to contradict her testimony on this point.

11.

The trial court wished to move on to December 10, as that event was "more relevant to the Court's inquiry in this case." Brambila responded he was addressing the December 1 incident because York's attorney asked about it. The trial court stated it would allow him to finish. Brambila then asked some questions about the November 23 text messages, but an objection was sustained on relevancy grounds. Brambila asked York if he stated a purpose for the text conversation; York responded, "Not directly, no." When the trial court asked him the question's relevance, Brambila responded section 527.6 required a course of conduct that had no purpose, and he was trying to show there was a purpose for the conversation which was stated in the text messages.

York confirmed the December 1 incident did not involve her husband and while her children were in the front room with her, Brambila never asked about them or mentioned them. York ran a private voice studio, but when Brambila asked if he was enrolled in the classes, the trial court found this was "getting far off field" and was "totally irrelevant." York confirmed she did not have any physical contact with Brambila during the December 1 incident. Brambila indicated the purpose of the visit was to speak with her, and Brambila did not threaten her with physical violence, although he tried to open the locked door.

Brambila asked a series of questions to which objections were sustained on grounds of relevance, lack of foundation, and being argumentative. York denied she asked her employer to file the workplace violence restraining order petition on her behalf, although she was aware her employer had done so and submitted a declaration in support of it. Brambila told the trial court he wanted to ask York about inconsistencies between that declaration and the declaration she submitted in this proceeding. York confirmed she stated in the declaration for the workplace violence restraining order that Brambila assaulted her, while in the declaration for the present case, she stated she assaulted him by gouging at his face and eyes.

12.

At this point, the trial court told Brambila that while he chose to represent himself, he was held to the same standards as any attorney, and it was disingenuous to claim York assaulted him if he was conceding he was in her backyard with a gun. Brambila denied making any concessions. York's attorney stated he would stipulate to the court taking judicial notice of the SCCCD filing, which Brambila accepted. The trial court stated it wanted to return to the December 10 incident, and whether Brambila was in the backyard.

York confirmed her children were in the backyard before she went out there and she did not mention them during the altercation with Brambila. The trial court asked Brambila if he was stipulating he was in the backyard; Brambila responded he was not stipulating to anything and he was using York's testimony of the incident. The trial court believed it was clear "this is a lot of game playing with the Court," but it would let the questioning go on for a little bit longer and then shut it down. York testified her statement did not mention where the children were because she did not look back after she walked down the side yard.

Brambila wanted to produce a graph "to clarify the incident for the Court," which he said showed where individuals were located. The trial court asked where he was located; Brambila responded he didn't care to say, as he would not be testifying. The trial court responded then the graph was irrelevant. Brambila wanted to invoke his federal and state constitutional rights against self-incrimination. The trial court stated that was fine, but then the graph was irrelevant. Brambila stated he would do it through questioning instead.

York confirmed the walkway on the side of the house was narrow and when she saw Brambila, she did not look back. When Brambila asked how she could then be aware her children were present, the trial court interjected that it did not see the relevance. Brambila stated he was trying to show the children were not a concern during this incident, or any other incident. The trial court responded the children did not need to

13.

be present when the assault occurred to need protection, and they and York's husband needed protection if they were in her home or on her property. The trial court told Brambila it would give him 10 more minutes.

Brambila asked York about the bandana he was wearing and tried to elicit testimony from her to show he was wearing it because of Covid-19. Because Brambila was not testifying, the trial court found such questions irrelevant. York confirmed Brambila never verbally threatened her during the December 10 incident or said he was going to harm her or members of her family, and instead said he did not intend to harm her. York also confirmed Brambila told her why he was pinning her wrist to the ground, but when asked what he said, York's attorney objected it was irrelevant and lacked foundation, as how would Brambila know what he said to her if he was not the person attacking her. Brambila asserted what he said was "absolutely important" to show intent. When the trial court stated it was irrelevant, he asked whether self-defense was irrelevant. The trial court asked if he was alleging he had the gun for self-defense; Brambila responded he was not testifying. The trial court stated he would have to testify to allege that and gave him five more minutes.

Brambila attempted to elicit testimony that York assaulted him, but the trial court stated that was irrelevant as he would have to testify to allege self-defense. Brambila asked York if she made a statement to the police about the position of the gun. When York's attorney objected based on relevance, Brambila stated he wanted to show York was not assaulted with a firearm, as it was never pointed at her, and York told police the gun was off to one side and was not pointed at her. The trial court asked York if she recalled making that statement. York stated she recalled "struggling with this bit of information" when she testified, but "[t]he gun was in his right hand and when I first saw it I felt that it was pointed at me." She recalled telling the police the gun was off to the side.

14.

Brambila asked York if she told the police that she gouged at his eyes. The trial court asked him why that was being offered. Brambila responded it had to do with York's assault of him. The trial court responded that was irrelevant unless he was testifying, and his time was up. Brambila objected, saying he had more questions. The trial court stated he needed to ask relevant questions, he asked maybe five relevant questions in about 20 minutes, and the court had "a duty and an obligation to make sure these proceedings go efficiently and expeditiously."

York confirmed she was familiar with the neighbor who appeared on the scene. Brambila then started to ask whether she heard him say, "I'm restraining you and you're hitting and kicking me," when the trial court asked if he was raising self-defense, as then it was irrelevant. Brambila responded it came out of the police report. The trial court found Brambila was wasting the court's time, as he was purposely and in bad faith conducting the cross-examination, he was not listening to the objections raised, and he had not followed the rules of evidence. The trial court further found Brambila was attempting to assert a defense while telling the court he was not taking the stand and subjecting himself to cross-examination. For those reasons, the trial court exercised its power to cease the cross-examination.

Brambila responded he was a pro per and trying to do his best. The trial court repeated he was held to the same standards as attorneys and stated it allowed him to go on for nearly 45 minutes, he hardly asked any relevant questions, and the only issues in the case were whether he was in the backyard uninvited, had a weapon, and assaulted York. The trial court added it understood Brambila was denying all that. Brambila stated his questioning had to do with that last point about the assault. The trial court explained it did not matter whether York was protecting herself and assaulted him, as she had a right to do so to get him out of the backyard if he was there uninvited.

15.

York's attorney was prepared to rest. The trial court asked Brambila if he wanted to add anything. Brambila argued none of the incidents in the petition met the statutory requirements for harassment and there was no course of conduct other than his desire to speak with York. He asserted he never made verbal threats during the December 10 incident, there was no physical assault or assault with a firearm, there was no history of violence between he and York, and he simply wanted to speak with her. Brambila asked the trial court, if it issued the restraining order, to not prevent him "from exercising his constitutionally significant interest of his education," as none of the events had anything to do with Fresno City College or its staff.

The trial court found by clear and convincing evidence that York "has been subjected to unlawful violence and a credible threat of violence and annoyingly willful [course] of conduct directed at her that seriously alarms, annoys, and harasses her and serves no legitimate purpose and the conduct by its nature would cause a reasonable person to suffer substantial emotional distress, and that she has so suffered." The trial court further found York would suffer great irreparable harm if an order is not issued because of the "reasonable probability that unlawful violence will occur in the future." The trial court made the order effective for the maximum period of five years. The trial court read the terms of the restraining order to Brambila in open court, which included personal conduct and stay-away orders that protected York and her family.

**DISCUSSION**

## I.     Res Judicata

We begin with Brambila's claim the trial court erred in overruling his demurrer to York's petition on the ground the doctrine of res judicata barred her from seeking a civil harassment restraining order. He argues res judicata applies because the SCCCD action and the present action involved the same three incidents and York was in privity with SCCCD.

16.

" 'Res judicata' describes the preclusive effect of a final judgment on the merits. Res judicata, or claim preclusion, prevents relitigation of the same cause of action in a second suit between the same parties or parties in privity with them.' " (*Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 896 (*Mycogen*).) "Under the doctrine of res judicata, if a plaintiff prevails in an action, the cause is merged into the judgment and may not be asserted in a subsequent lawsuit." (*Ibid.*) Whether the doctrine of res judicata applies is a question of law subject to de novo review. (*City of Oakland v. Oakland Police & Fire Retirement System* (2014) 224 Cal.App.4th 210, 228.)

"Three elements must exist for res judicata (or claim preclusion) to apply: ' "(1) the decision in the prior proceeding is final and on the merits; (2) the present proceeding is on the same cause of action as the prior proceeding; and (3) the parties in the present proceeding or parties in privity with them were parties to the prior proceeding." ' " (*Association of Irritated Residents v. Department of Conservation* (2017) 11 Cal.App.5th 1202, 1219.)

"California law defines a 'cause of action' for purposes of the res judicata doctrine by analyzing the primary right at stake: '[A] "cause of action" is comprised of a "primary right" of the plaintiff, a corresponding "primary duty" of the defendant, and a wrongful act by the defendant constituting a breach of that duty.' … ' "[I]f two actions involve the same injury to the plaintiff and the same wrong by the defendant then the same primary right is at stake even if in the second suit the plaintiff pleads different theories of recovery, seeks different forms of relief and/or adds new facts supporting recovery. [Citations.]" ' [Citation.] 'On the other hand, different primary rights may be violated by the same wrongful conduct.' " (*Le Parc Community Assn. v. Workers' Comp.*

*Appeals Bd.* (2003) 110 Cal.App.4th 1161, 1170; see *Mycogen*, *supra*, 28 Cal.4th at p. 904 ["California's res judicata doctrine is based upon the primary right theory"].)[2]

Res judicata, or claim preclusion, does not bar York's action for a civil harassment restraining order under section 527.6 because it is not the same cause of action as asserted in the SCCCD action. The SCCCD action sought a workplace violence restraining order pursuant to section 527.8, which enables "[a]ny employer, whose employee has suffered unlawful violence or a credible threat of violence from any individual, that can reasonably be construed to be carried out or to have been carried out at the workplace," to "seek a temporary restraining order and an order after hearing on behalf of the employee and, at the discretion of the court, any number of other employees at the workplace, and, if appropriate, other employees at other workplaces of the employer." (§ 527.8, subd. (a).) In this action, York sought relief under section 527.6, which authorizes a "person who has suffered harassment" (§ 527.6, subd. (a)(1)) to obtain an injunction against the harassing conduct.

The two causes of action are not the same because they address different primary rights. The primary right at issue in the SCCCD action was the employer's right to maintain a workplace free of violence. (*Robinzine v. Vicory* (2006) 143 Cal.App.4th 1416, 1423 ["section 527.8 was enacted to allow employers to seek protections comparable to those offered under section 527.6 to enjoin workplace threats or acts of violence against employees"]; *Scripps Health v. Marin* (1999) 72 Cal.App.4th 324, 334 [the Legislature enacted § 527.8 "to address the growing phenomenon in California of workplace violence by providing employers with injunctive relief so as to *prevent* such

---

[2]    Brambila raises other theories for determining whether the two causes of action are identical. The Supreme Court has clearly stated that California courts apply the primary rights theory to determine if the two proceedings involve the same cause of action. (*Boeken v. Philip Morris USA, Inc.* (2010) 48 Cal.4th 788, 797-798; *Mycogen*, *supra*, 28 Cal.4th at p. 904.)

acts of workplace violence"].)  In contrast, the primary right at issue in a civil harassment restraining order proceeding is an individual's right to enjoin "unlawful violence, a credible threat of violence" or conduct that "seriously alarms, annoys, or harasses" that individual.  (§ 527.6, subd. (b)(3); *Grant v. Clampitt* (1997) 56 Cal.App.4th 586, 591 [§ 527.6 "was enacted to protect the individual's right to pursue safety, happiness and privacy as guaranteed by the California Constitution"].)

Thus, although the two causes of action are based on the same set of underlying facts, they involve different primary rights—the employer's right to maintain a violence-free workplace versus an individual's right to be free from harassment.  Since the causes of action are not the same, res judicata does not bar the present action and the trial court did not err in overruling Brambila's demurrer on this ground.

## II.     The Civil Harassment Restraining Order

We next turn to Brambila's claims concerning the issuance of the restraining orders.  He argues the evidence was insufficient to support issuance of the restraining order because there was no evidence showing a threat of future violence, the trial court erred in limiting his cross-examination of York, and the restraining order was overly broad.

### A.     *Governing Law and Standard of Review*

Section 527.6, which governs civil harassment restraining orders, authorizes the trial court to issue both temporary and permanent restraining orders to "[a] person who has suffered harassment."  (§ 527.6, subd. (a).)  " 'Harassment' " is defined to include three different types of conduct:  (1) "unlawful violence"; (2) "a credible threat of violence"; or (3) "a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate

purpose."[3]  Although not expressly provided in section 527.6, case law has established that "[a]n injunction restraining future conduct" under that statute "is only authorized when it appears that harassment is likely to recur in the future." (*Harris v. Stampolis* (2016) 248 Cal.App.4th 484, 499 (*Harris*), citing *Russell v. Douvan* (2003) 112 Cal.App.4th 399, 402–403 (*Russell*).)

"A temporary restraining order may be issued with or without notice, based on a declaration that, to the satisfaction of the court, shows reasonable proof of harassment of the petitioner by the respondent, and that great or irreparable harm would result to the petitioner." (§ 527.6, subd. (d).)  Such a temporary restraining order "shall remain in effect, at the court's discretion, for a period not to exceed 21 days, or, if the court extends the time for hearing under subdivision (g), not to exceed 25 days, unless otherwise modified or terminated by the court." (*Id.*, subd. (f).)  "Within 21 days, or, if good cause appears to the court, 25 days from the date that a petition for a temporary order is granted or denied, a hearing shall be held on the petition." (*Id.*, subd. (g).)  At the ensuing hearing, "the judge shall receive any testimony that is relevant, and may make an independent inquiry.  If the judge finds by clear and convincing evidence that unlawful harassment exists, an order shall issue prohibiting the harassment." (*Id.*, subd. (i).)

"We review issuance of a protective order for abuse of discretion, and the factual findings necessary to support the protective order are reviewed for substantial evidence." (*Parisi v. Mazzaferro* (2016) 5 Cal.App.5th 1219, 1226, disapproved on other grounds by *Conservatorship of O.B.* (2020) 9 Cal.5th 989 (*O.B.*).)  "Whether the facts are legally

---

[3]  As to the third prong, the statute also requires the court to find that "[t]he course of conduct must be that which would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the petitioner." (§ 527.6, subd. (b)(3).)

20.

sufficient to constitute civil harassment within the meaning of section 527.6 is a question of law reviewed de novo." (*Parisi*, at p. 1226.)

Since the trial court must make its findings by clear and convincing evidence, the question before the appellate court "is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*O.B.*, *supra*, 9 Cal.5th at pp. 1011–1012.) In deferring to the trier of fact's determinations as to the credibility and weight of the evidence, we disregard evidence contrary to the judgment. (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 582.)

### B.      *Substantial Evidence Supports Grant of Restraining Order*

Brambila does not seriously contest that his December 10 physical assault on York amounted to "unlawful violence" within the meaning of section 527.6, which defines the term as "any assault or battery, or stalking as prohibited in Section 646.9 of the Penal Code, but does not include lawful acts of self-defense or defense of others." (§ 527.6, subd. (b)(7).) In his declaration attached to his response to York's request for a restraining order, Brambila conceded that he bit York's hand and restrained her after they fell on the ground. While Brambila claimed he did so in self-defense, Brambila did not offer any evidence of this at the hearing.

To the contrary, York's testimony established that Brambila hid in her backyard and when she approached his hiding place, he came out and she yanked down the bandana he was wearing over his face and yelled for him to leave. When he made clear he had a weapon, which he pointed in her general direction, York clawed at his face, and he bit her. They continued to struggle and when they fell to the ground, Brambila sat on

21.

top of her and pinned her arm to the ground, leaving scratches on her hand, until police arrived. The incident was not instigated by York, as Brambila claims, but rather by Brambila's uninvited presence in the backyard armed with a weapon. "[T]he testimony of a single witness, even a party, may alone constitute substantial evidence." (*Chase v. Wizmann* (2021) 71 Cal.App.5th 244, 257.) Here, York's testimony establishes Brambila subjected her to unlawful violence during the December 10 incident.

Brambila's primary argument is that York failed to establish any risk of future harm. As we have already noted, a finding that Brambila harassed York within the meaning of section 527.6 does not mean that a civil harassment restraining order automatically issues. (*Russell*, *supra*, 112 Cal.App.4th at p. 401; *Harris*, *supra*, 248 Cal.App.4th at p. 499.) Rather, "[a]n injunction restraining future conduct is only authorized when it appears that harassment is likely to recur in the future." (*Harris*, at p. 499.)

Here, the trial court specifically found York would suffer "[g]reat irreparable harm" if a restraining order was not issued "because of [the] reasonable probability that unlawful violence will occur in the future." The evidence fully supports the trial court's finding. Even if the trial court focused on the December 10 incident of physical violence, there was abundant evidence this incident was the culmination of the two prior events—the exchange of text messages on November 23, in which Brambila insisted on talking to York in person, and the December 1 incident in which he came to her home uninvited and demanded to talk to her. (*R.D. v. P.M.* (2011) 202 Cal.App.4th 181, 189–190 [court may "consider any evidence showing a likelihood of future harassment, including evidence of conduct that might not itself constitute harassment"].)

The evidence demonstrates Brambila was obsessed with speaking with York in person and this obsession escalated over the course of a few weeks leading to the December 10 assault. Brambila insists his actions were innocent, as he only wanted to

speak with her, and York overreacted. But given Brambila's refusal to accept that York did not want to talk to him in person, which continues in this appeal, and his lack of insight into the effect his actions had on York, as well as the criminality of his actions, the trial court reasonably could find the unlawful violence was likely to recur. Moreover, Brambila insists he wants to continue his education at Fresno City College, making it likely he would continue to encounter York. Under these circumstances, substantial evidence supports the trial court's finding of future harm.

### C. *The Trial Court Did Not Err in Limiting Cross-Examination*

In a convoluted argument, Brambila asserts the trial court made inconsistent findings concerning the materiality of the November 23 and December 1 incidents. Brambila complains that while the trial court denied his motion to strike these incidents from the petition, which he brought on the ground the incidents did not constitute harassment within the meaning of section 527.6, the trial court later discounted these incidents at the hearing when it repeatedly told him it was more interested in hearing testimony about the December 10 incident and cut off his cross-examination concerning the prior incidents.

The prior incidents were not necessary to determine whether harassment occurred since, as we have explained, the December 10 incident of unlawful violence was sufficient to establish harassment under section 527.6. However, as Brambila asserts and as we discussed above, the prior incidents were relevant to determine future threat of harm. Because the incidents were relevant to determine whether the requirements of section 527.6 were established, the trial court did not err in denying the motion to strike these allegations from the petition.

Brambila's real complaint is that the trial court limited his cross-examination of York concerning the November 23 and December 1 incidents, which he asserts violated

his constitutional and statutory due process rights. He claims the trial court repeatedly rushed his questioning of York and discounted his cross-examination.

A trial court is required to "exercise reasonable control" over the mode of questioning witnesses to make the interrogation as rapid, distinct, and effective as possible to ascertain the truth and to protect witnesses from undue harassment or embarrassment. (Evid. Code, § 765, subd. (a).) This includes the "broad discretion … to keep cross-examination within reasonable bounds." (*People v. Jones* (1962) 207 Cal.App.2d 415, 421–422; *Dollinger v. San Gabriel Lines* (1962) 205 Cal.App.2d 705, 710–711.)

" 'A trial court has a clear duty to supervise the conduct of the trial to the end that it may not be unduly protracted and that other litigants too may have their day in court. In carrying out this duty the court may confine cross-examination within reasonable limits and may curtail cross-examination which relates to matters already covered, or which are irrelevant. These are matters clearly within the court's discretion and only a manifest abuse thereof will require a reversal.' " (*Dollinger v. San Gabriel Lines*, *supra*, 205 Cal.App.2d at pp. 710–711; *McClure v. Donovan* (1949) 33 Cal.2d 717, 736 [trial court has considerable latitude concerning the length of examination of witnesses, especially in a non-jury case].)

Brambila has not shown the trial court abused its discretion. Contrary to Brambila's assertion, the trial court allowed him to cross-examine York about both the November 23 and December 1 incidents. Brambila does not dispute that many of his questions were irrelevant or otherwise improper, as the trial court determined in its unchallenged evidentiary rulings. The court ended Brambila's time for cross-examination only after he persisted, in the face of repeated admonitions, in asking irrelevant questions. Brambila's conduct reasonably could have led the court to

24.

determine that allowing additional time for cross-examination would not yield material evidence.

Brambila points to instances where the trial court stated it was more concerned with the December 10 incident, which he claims shows the trial court arbitrarily limited the cross-examination. The trial court's first statement in this regard occurred after Brambila asked York numerous questions about the December 1 incident and the November 23 text messages, as well as about York sending him a letter with her address on it. When York's counsel made an offer of proof concerning the letter, the trial court stated it was making "clear to both parties" that it was not concerned with what happened on December 1 and was more concerned about what happened on December 10. The trial court further explained that it was "of no moment" what happened on December 1 "as much as in weighing all the circumstances of what's occurred on December 10th."

The court and Brambila then discussed the letter's relevance, with Brambila asserting it showed she provided him with her address, which contradicted her statement she did not give him her address. The trial court stated it understood, but it "wish[ed] we would move onto December 10th and the events of that date as being more relevant to the Court's inquiry in this case." Nevertheless, when Brambila told the court he was addressing the December 1 incident because York was asked about it on direct examination, the trial court stated it would allow Brambila to "finish."

Brambila then had York confirm he was an "A student" and asked if it would be unthinkable for an "A student" to unexpectedly drop a class. After the trial court sustained a relevance objection, Brambila began to explain he was addressing a phrase in the November 23 text messages. The trial court stated it understood, but "we're here on a restraining order alleging that you assaulted her and pulled a gun on her. All right. That's why we're here so either that happened or it didn't happen." When Brambila responded that he was "getting to that," the trial court stated, "Okay. So let's move on."

25.

Brambila then continued to ask questions about the November 23 text messages and December 1 incident. After Brambila asked a series of questions comparing York's declaration filed in the SCCCD action with her declaration in the present action, the parties stipulated to the trial court taking judicial notice of the SCCCD filings. The trial court then stated: "Let's move on, Mr. Brambila. We spent way too much time on this as far as it is. I would like us to return to the December 10th incident and were you or were you not in the backyard."

These excerpts do not show that the trial court limited Brambila's questions concerning the November 23 and December 1 incidents. Rather, after Brambila asked many irrelevant questions, the trial court encouraged Brambila to focus on the December 10 incident, which it properly viewed as the central issue. The trial court nevertheless allowed Brambila to ask about the earlier incidents. The record simply does not support Brambila's interpretation of the court's statements.

Brambila asserts the trial court continually rushed and bullied him. He claims the trial court violated its duty under Canon 3(B)(4) of the California Code of Judicial Ethics, which requires the judge to "be patient, dignified, and courteous to litigants," and Canon 3(B)(8), which requires the judge to "manage the courtroom in a manner that provides all litigants the opportunity to have their matters fairly adjudicated in accordance with the law." We have reviewed the transcript of the hearing which shows the trial court was patient with Brambila and granted him ample opportunity to present his case. This is not a situation, as in *Schraer v. Berkeley Property Owners' Assn.* (1989) 207 Cal.App.3d 719, 725, 733, which Brambila relies on, where the trial court did not permit live testimony or cross-examination of the petitioner. Brambila was given a full opportunity to present his case and present relevant oral testimony. (*Schraer*, at p. 733 [in § 527.6 proceeding, "relevant oral testimony must be taken from available witnesses"].)

In sum, Brambila has not shown the trial court abused its discretion in controlling the proceedings, including his cross-examination of York.

### D.     *The Restraining Order Is Not Overbroad*

The restraining order requires Brambila to stay at least 100 yards away from York and her family, as well as 100 yards from York's home, job, and workplace.  Brambila asserts this is overly broad because there was no showing the harassment was related to Fresno City College and the order effectively denies him the right to attend school and prevents him from continuing his education.

Brambila claims education is a constitutionally significant interest which the restraining order infringes on, but he does not cite any authority to support this claim.  He asserts the Legislature has indicated education is constitutionally significant because an entire article is dedicated to education in the California Constitution.  He specifically cites to section 1 of article IX of the California Constitution, which provides:  "A general diffusion of knowledge and intelligence being essential to the preservation of the rights and liberties of the people, the Legislature shall encourage by all suitable means the promotion of intellectual, scientific, moral, and agricultural improvement."

While every child has a legal right to attend a public school (*Campaign for Quality Education v. State of California* (2016) 246 Cal.App.4th 896, 906–907), Brambila does not cite any authority that this right extends to adult college students.  Section 1, article IX of the California Constitution does not establish such a right; that section creates a duty to encourage promotion of intellectual, scientific, moral and agricultural improvement, but it is " 'general and aspirational' " and does not provide "how the Legislature is to achieve its goal except to use ' "all suitable means." ' " (*Campaign for Quality Education*, at p. 908.)  Moreover, the restraining order does not prevent Brambila from attending college; rather, it requires him to stay 100 yards away from York's workplace.  To the extent that prevents him from attending Fresno City College,

27.

Brambila does not cite any authority there is a constitutional right to attend a particular college.**4**

Because Brambila fails to cite any legal authority to support his assertion that the restraining order is constitutionally overbroad, we disregard his argument. (*City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 287 ["we may disregard conclusory arguments that are not supported by pertinent legal authority or fail to disclose the reasoning by which the appellant reached the conclusions he wants us to adopt"]; *Keyes v. Bowen* (2010) 189 Cal.App.4th 647, 655–656 [matters not properly raised or that lack adequate legal discussion will be deemed forfeited].)

### III. The Continuances of the Hearing on the Petition

Brambila asserts the trial court abused its discretion when it granted six continuances of the hearing on York's petition. Brambila argues: (1) the number and

---

**4** Brambila has filed a motion under rule 8.252(c) of the California Rules of Court asking us to consider additional evidence that was not presented in the trial court, namely, a Fresno City College campus map and his declaration, in which he states that he is a Fresno City College music student in good standing majoring in music voice, he has completed half the requirements toward an associate's degree in music voice, and because virtually every music voice class is taught in a single building it would be impossible to attend class and stay 100 yards away from York. Brambila asserts the evidence is relevant to show the restraining order prevents him from attending class and thus infringes on his constitutional right to an education.

We deny the motion. Although section 909 permits an appellate court to take additional evidence for the purpose of making independent factual findings, this authority " 'is to be used sparingly and has been narrowly construed.' " (*In re L.B.* (2003) 110 Cal.App.4th 1420, 1423, fn. 1.) "*Absent exceptional circumstances, no such findings should be made.*" (*In re Zeth S.* (2003) 31 Cal.4th 396, 405.) Brambila does not attempt to establish, nor do we find, that this case presents such an exceptional circumstance. Moreover, decisions limiting the use of the power to take new evidence involved attempts to introduce evidence that existed at the time of trial. (*In re L.B.*, *supra*, 110 Cal.App.4th at p. 1423, fn. 1.) This reason for declining to accept new evidence on appeal applies here, as the evidence Brambila asks us to consider was available at the time of the hearing on York's petition.

28.

duration of the continuances were unreasonable; (2) the continuances violated the expeditious nature of a section 527.6 action; (3) there was no showing of good cause; and (4) the temporary restraining order was improperly extended far beyond the maximum duration indicated in section 527.6. He contends the continuances resulted in a miscarriage of justice because absent the continuances, the restraining order would have issued a year and half earlier and therefore would expire that much earlier. Brambila asserts the resulting extension of the restraining order prevents him from attending school that much longer, thereby trampling on his "constitutionally significant interest to his education." He asks us to "back-date" the trial court's order granting the restraining orders to March 15, 2021, which he asserts is the date the order would have taken effect had the continuances not been granted.

Whether to grant a continuance is committed to the trial court's discretion and its ruling will not be disturbed unless a clear abuse of discretion is shown. (*Forthmann v. Boyer* (2002) 97 Cal.App.4th 977, 984–985; *Larson v. Solbakken* (1963) 221 Cal.App.2d 410, 429.) The trial court must exercise its discretion considering the interests of all involved and "should exercise liberality in granting a continuance to obtain the presence of material evidence and to prevent miscarriages of justice." (*Larson*, at p. 429.) The reviewing court may find an abuse of discretion "if the record indicates [the continuance] resulted in probable or possible prejudice to a party." (*Ibid.*)

We need not discuss whether there was good cause to grant the multiple continuances because the record does not disclose any resulting prejudice to Brambila. Brambila claims he is prejudiced because he will be deprived of his constitutional right to an education for a longer period due to the effective one-and-a-half-year extension of the five-year restraining order. But as we have discussed above, he has not cited any authority establishing a constitutional right to an education at the college of his choosing.

At best, the restraining order prevents him from attending Fresno City College—it does not prevent him from pursuing an education at another college.

In any event, because Brambila was incarcerated throughout these proceedings, he could not attend school. Even if he is released from custody before the restraining order expires in April 2027, York may renew the restraining order for a maximum of five additional years without a showing of further harassment. (§ 527.6, subd. (j)(1).) Thus, it is not the so-called extension of the restraining order that impinges on any right Brambila may have to attend Fresno City College, but rather his harassment of York that prohibits him from having contact with her.

Brambila asserts the remedy for the improper continuances is for us to "back-date" the restraining order to March 2021. While the trial court ruled at the December 6, 2021 hearing that there was good cause for the continuances, Brambila did not ask the trial court to reduce the length of the restraining order due to the many continuances. Brambila's failure to raise this specific issue below forfeits it on appeal. (*Howitson v. Evans Hotels, LLC* (2022) 81 Cal.App.5th 475, 489 ["the failure to raise an issue in the trial court typically forfeits on appeal any claim of error based on that issue"]; *Ochoa v. Pacific Gas & Electric Co.* (1998) 61 Cal.App.4th 1480, 1488, fn. 3 ["arguments not asserted below are waived and will not be considered for the first time on appeal"].)

## IV.   The Discovery Ruling

Finally, Brambila contends the trial court erred in barring his two requests for discovery: the requests for admissions and the request for electronic information.

The record shows that Brambila served requests for admissions on York's attorney by mail on April 17, 2021, which were directed at York, her husband, and her neighbor. Brambila requested a continuance of the April 26, 2021 hearing because he was awaiting responses to the requests, and the trial court continued the hearing to June 7, 2021. Although Brambila apparently did not receive responses, the record does not show that he

requested court intervention with respect to them,[5] such as by filing a motion to have the truth of the matters specified in the requests be deemed admitted, as allowed by section 2033.280, subdivision (b), or otherwise raise the failure to respond in the trial court. Because there is no trial court ruling to review with respect to the requests for admission, Brambila has not shown any trial court error with respect to the requests.

With respect to the electronic information, the record shows Brambila filed a motion for sanctions on February 3, 2022, in which he asserted he served York's attorney with a request to bring electronically stored information, namely, Zoom class sessions and a Zoom meeting with Dean Henderson, to the December 6, 2021 hearing, but the information was not provided. Brambila further asserted he invited York's attorney to meet and confer with him at the Fresno County jail, but the attorney did not appear or respond. In the motion, Brambila requested, among other things, monetary sanctions under section 2023.010 for misuse of the discovery process, and to terminate the temporary restraining order and stay the proceedings until York produced the requested materials.

The trial court denied the motion at the outset of the April 25, 2022 hearing on York's petition, stating there had not been a finding of misuse of the discovery process as defined in section 2023.010, and there is no discovery in a civil harassment case. The trial court also asked Brambila why he wanted the electronic information; Brambila

---

[5]     Brambila asserts he raised York's failure to respond to the requests for admission and made an oral motion for sanctions at the April 26, 2021 hearing, which the trial court denied on the ground discovery was not available. While Brambila points to the minute order of the hearing to support his assertion, the minute order does not show that Brambila raised any issue with respect to the requests for admission, and there is no transcript of the hearing. In any event, the trial court would be justified in denying any motion to compel or for sanctions made at that time, as the time to respond to the requests had not expired. (§ 2033.250, subd. (a) [responding party has 30 days after service of the requests for admission to serve the response on the requesting party].)

responded it spoke to York's credibility. The trial court then stated it was going to deny the motion and proceed with the hearing.

Section 527.6 establishes a quick and truncated procedure for the limited scope of preventing harassment in contrast to normal injunctive procedures that allow time for investigation, pleadings, and discovery, followed by an opportunity for a full trial. (*Byers v. Cathcart* (1997) 57 Cal.App.4th 805, 811; *Diamond View Limited v. Herz* (1986) 180 Cal.App.3d 612, 619–620, fn. 8 [§ 527.6 "significantly changed the ordinary procedures and requirements in actions for injunctive relief by altering the provisions relating to pleading, temporary restraining orders, undertakings, attorney's fees, discovery and trial"].) The statute is designed to adjudicate claims of harassment in an expedited fashion, normally on a schedule lasting no more than 25 days from either the grant of a temporary restraining order or the filing of the petition. (§ 527.6, subd. (g); see *Thomas v. Quintero* (2005) 126 Cal.App.4th 635, 649.)

While section 527.6, subdivision (i) requires the court to "receive any testimony that is relevant" at the hearing, "[t]here is no provision under section 527.6 allowing for discovery, and in any case, under the civil harassment scheme there is insufficient time in which to conduct discovery." (*Thomas v. Quintero*, *supra*, 126 Cal.App.4th at p. 650, fn. 11.) In addition to the short timeframe, discovery involving restraining orders in response to harassment would undercut the statute's efforts to protect victims from unwanted contact by the restrained person.

Brambila asserts the trial court erred in barring discovery. He argues that the Code of Civil Procedure allows discovery in section 526.7 actions and neither *Thomas v. Quintero* nor *Byers v. Cathcart* held, not that discovery is unavailable in such actions, but rather that discovery could not usually be completed because the hearings occur so quickly. Brambila contends that since time is the only issue with respect to whether

32.

discovery is available, there was more than enough time for discovery in the present action due to the many continuances.

The trial court's denial of the sanctions motion was well within its discretion. (*Obregon v. Superior Court* (1998) 67 Cal.App.4th 424, 430 [trial court's order on motion for sanctions reviewed for abuse of discretion].) Brambila did not seek to compel production of the electronic information until February 2022. By the time the trial court heard Brambila's motion in April 2022, time was an issue as it had been 14 months since the temporary restraining order issued. To compel York to produce the requested information would have required yet another continuance of the proceedings, which Brambila had been continually objecting about. The trial court inquired of the significance of the information Brambila sought and determined it did not justify further delay of the proceeding. Having correctly recognized discovery is not contemplated by the summary proceeding established by the civil harassment statute, the trial court properly denied Brambila's motion.

Moreover, Brambila has failed to demonstrate it is reasonably probable the outcome of the hearing would have been more favorable to him had the trial court granted his discovery motion. (*Conservatorship of Maria B.* (2013) 218 Cal.App.4th 514, 532–533 [appellant bears burden to make affirmative showing the trial court committed error and that error resulted in a miscarriage of justice].) Brambila told the trial court he wanted the Zoom materials to attack York's credibility, a claim he reasserts on appeal, but he fails to explain how they would achieve that. Moreover, he was able to attack her credibility at the hearing. Given that Brambila did not deny his presence in York's backyard and did not testify, Brambila has failed to show it is reasonably probable the trial court's decision would have been more favorable to him had the trial court granted his discovery motion. (*MacQuiddy v. Mercedes-Benz USA, LLC* (2015) 233 Cal.App.4th 1036, 1045.)

## **DISPOSITION**

The order granting York's request for civil harassment restraining orders pursuant to section 527.6 is affirmed.  York is entitled to her costs on appeal.

DE SANTOS, J.

WE CONCUR:

SMITH, Acting P. J.

SNAUFFER, J.